THE PORT OF NEW YORK AUTHORITY, PLAINTIFF-RE-SPONDENT, v. THE CITY OF NEWARK, *ET AL.*, DE-FENDANTS-APPELLANTS.

Argued December 12, 1955—Decided January 16, 1956.

*Mr. Vincent P. Torppey* argued the cause for appellants (*Mr. Algernon T. Sweeney,* on the brief).

*Mr. Russell E. Watson* argued the cause for respondent (*Miss Isobel Muirhead,* and *Mr. Sidney Goldstein, Mr. Daniel B. Goldberg* and *Mr. Joseph Lesser,* of the New York Bar, on the brief).

The opinion of the court was delivered by

WACHENFELD, J. The effort here is to reverse a judgment of the Superior Court, Law Division, setting aside tax assessments levied by the City of Newark for the years 1952 and 1953 on property owned by the Port of New York Authority and known as the Newark Union Motor Truck Terminal, or Inland Terminal No. 3. Because of the importance of the question presented, we granted certification prior to disposition of the case in the Appellate Division.

In 1921, following the report of the New York, New Jersey Port and Harbor Development Commission, the States of New York and New Jersey entered into a Compact, con-

sented to by Congress, in which the two states specifically pledged to each other their "faithful co-operation in the future planning and development" of the Port of New York. To effectuate the broad purpose of the Compact, the Legislatures created a body corporate and politic known as the " 'Port of New York Authority,' " which they endowed, *inter alia*, with "full power and authority to purchase, construct, lease and/or operate any terminal or transportation facility within said district; and to make charges for the use thereof * * *." See *N. J. S. A.* 32 :1–2, 4, 7.

In 1922 the two Legislatures adopted a "Comprehensive Plan for the Development of the Port of New York," *N. J. S. A.* 32 :1–25 *et seq.*, which stated certain principles to govern the development of the Port as follows (*N. J. S. A.* 32 :1–26) :

"First—That terminal operations within the port district, so far as economically practicable, should be unified;

Second—That there should be consolidation of shipments at proper classification points, so as to eliminate duplication of effort, inefficient loading of equipment, and realize reduction in expenses;

Third—That there should be the most direct routing of all commodities, so as to avoid centers of congestion, conflicting currents and long truck hauls;

Fourth—That terminal stations established under the comprehensive plan should be union stations, so far as practicable; * * *."

From the foregoing it may readily be seen that the purposes for which the Port of New York Authority was created, as set forth in the Compact of 1921 and the statement of principles contained in the 1922 Comprehensive Plan, specifically envisioned and authorized the construction and operation by the Port of New York Authority of union freight terminal facilities.

Pursuant to the legislative mandate the Port of New York Authority undertook a study of the freight terminal needs of the Port. The first tangible result of the study was the construction of a railroad freight terminal station in the City of New York known as Inland Terminal No. 1, which was completed in 1932. This terminal facility provides for the trans-shipment of less than carload railroad freight to

delivery points within the metropolitan area. By 1939, however, it became apparent that motor trucks were, to a large extent, displacing railroad carriers in the haulage of small freight shipments, with the result that the bridge and tunnel facilities of the Port Authority and local streets and highways were suffering extreme congestion.

A study was initiated by the Port Authority in 1939 to ascertain the advisability of construction by the Port Authority of union motor truck terminals. The first Staff Report was submitted in 1941 and recommended the construction of a motor truck terminal in the City of New York, which has since been built and is known as Inland Terminal No. 2. The second Staff Report, submitted in 1945, proposed the construction of a similar motor truck terminal in the Newark area to serve the needs of Northern New Jersey.

Briefly described, the function of a motor truck terminal is to provide terminal facilities for over-the-road, long-haul carriers so that small loads can be efficiently assorted and trans-shipped via smaller trucks and vehicles for distribution within the local area served by the terminal. The Port Authority staff study concluded that "from the standpoint of the community the benefits will be less congestion in city streets, less congestion at shippers' platforms, more expedition in handling and ultimately cheaper cost of transportation as terminal economies are reflected in the elimination of excess delivery charges, higher charges for minimum shipments, etc."

Following a public hearing in 1945 at which almost all persons present voiced praise and approval of the Newark motor truck terminal plan, the respective Legislatures of New York and New Jersey adopted concurrent statutes providing for the financing of the project, *N. J. S. A.* 32:1–141.1, *et seq.*

Construction of Inland Terminal No. 3, in Newark, commenced in August of 1947. The terminal was completed in 1949 at a cost of $8,300,000.

However, in September 1948, shortly before the terminal was completed, the Newark Local of the International

Brotherhood of Teamsters, Local No. 478, inserted, for the first time, a clause in its standard contract with employers which prohibited over-the-road carriers who were parties to Local 478 contracts from transferring, without the union's permission, more than 5,000 pounds of freight daily to local cartage companies. Both parties concede that this clause in effect made operation of the terminal under the Port Authority's plan impossible, since that plan depended entirely upon the trans-shipment of freight from over-the-road carriers to smaller local trucks operated by local cartage companies.

The Port Authority, with the cooperation of officials of the City of Newark, made repeated efforts to induce Local 478 to eliminate the 5,000-pound limitation from its contracts with employers or to waive its application to the terminal. Simultaneously, the Port Authority sought, through the Executive Board of the International Brotherhood of Teamsters with which Local 478 was affiliated, to procure a change in the 5,000-pound limitation. All of these efforts were to no avail, and in January 1951 Local 478 flatly refused to waive the 5,000-pound limitation. Each subsequent renewal of Local 478's contracts has, despite the International's express disapproval, contained the 5,000-pound limitation.

In November 1950, while negotiations with the Local and other parties in interest were proceeding with respect to the 5,000-pound clause, the Port Authority entered into an agreement with the City of Newark pursuant to the "in-lieu-of" tax statute, *N. J. S. A.* 32:1–144, which provides:

"To the end that * * * cities * * * may not suffer undue loss of taxes and assessments by reason of the acquisition and ownership of property therein by the Port of New York Authority (hereinafter called the port authority), the port authority is hereby authorized and empowered, in its discretion, to enter into a voluntary agreement or agreements with any * * * city * * * in said port district, whereby it will undertake to pay a fair and reasonable sum or sums annually in connection with any marine or inland terminal property owned by it, not in excess of the sum last paid as taxes upon such property prior to the time of its acquisition by the port authority * * *."

Under the terms of the agreement concluded between the Port Authority and the City of Newark, the Port Authority agreed to pay to the city, in lieu of taxes, the maximum amounts permitted under the above-quoted statute, retroactive to 1947, the year in which the Port Authority acquired the land on which the terminal was built.

When the negotiations with Local 478 ended in failure, the Port Authority was faced with an acute dilemma. It had on its hands an $8,300,000 structure which had been idle for more than a year and which was, to all intents and purposes, useless for the purpose for which it had been built. However, early in 1951, following the outbreak of the undeclared war in Korea, the United States Air Force indicated its intention to "take over" all of Port Newark for its operations in connection with the Korean conflict and for the Mutual Defense Assistance Program. According to a witness at the trial below, the Air Force "made it known that they were going to, with all the powers they had, take back Port Newark and Newark Airport," which they had operated during World War II.

The Port Authority was opposed to the action which the Air Force contemplated, since it desired to maintain Port Newark as a commercial rather than a military port. Following negotiations between the Air Force and the Port Authority, an agreement was ultimately worked out whereby the Air Force limited its use of property at Port Newark, and as part of the arrangement the Air Force leased the then idle Inland Terminal No. 3 for a period commencing March 14, 1951 and expiring June 30, 1955.

Under the terms of the lease the terminal was to be used as an Air Force in-transit depot for the storage, handling and processing of United States Air Force materiel, and the Air Force was required to safeguard equipment in the building which was installed by the Port Authority for use in the unified truck terminal operation. The Air Force rental was fixed at $421,754 per annum, which amount approximates the debt service and fixed charges on the terminal without allowing for any profit to the Port Authority.

Following the execution of the lease the City of Newark levied, on the appropriate dates, assessments for the years 1952 and 1953 on the land and the buildings which comprise Inland Terminal No. 3. The Port Authority thereupon commenced this action in lieu of prerogative writ to set aside the assessments.

Initially, it is to be noted that nowhere has the Legislature of either New York or New Jersey granted a specific exemption from local property taxation for property owned or used by the Port of New York Authority as an inland terminal. The exemption, if it exists, must spring from and be implied by the "in-lieu-of" tax statute quoted above, which provides for voluntary payments by the Port of New York Authority to a local municipality to relieve the municipality of the burden resulting from the removal of Port Authority property from the local tax rolls. *New Jersey Turnpike v. Washington Tp.*, 16 *N. J.* 38 (1955).

██ It is true, of course, that ordinarily exemption from local property taxation is to be strictly construed and will not be extended beyond the terms of the legislative grant. *Trustees of Rutgers University v. Piscataway Twp.*, 134 *N. J. L.* 85, 86 (*Sup. Ct.* 1946); *City of Trenton v. State Bd. of Tax Appeals*, 127 *N. J. L.* 105, 106 (*Sup. Ct.* 1941), affirmed *sub nom. City of Trenton v. Rider College*, 128 *N. J. L.* 320 (*E. & A.* 1942); *Sisters of Charity of St. Elizabeth v. Cory*, 73 *N. J. L.* 699, 706 (*E. & A.* 1907). However, it is obvious in the case *sub judice* that the Legislatures of both New York and New Jersey must have deemed the Port Authority's inland terminal property to be tax exempt; otherwise there would be no need for relief to a local municipality via the "in-lieu-of" tax statute.

This was the precise holding of the New York Court of Appeals in *Bush Terminal Co. v. City of New York*, 282 *N. Y.* 306, 26 *N. E.* 2d 269 (1940), which involved the tax exempt status of the Port Authority's Inland Terminal No. 1. The New York Court of Appeals, in holding that the "in-lieu-of" tax statute provided for an exemption from local property taxation, said (26 *N. E.* 2d, at *page* 274):

"Its language indicates that the Legislature assumed that such buildings, erected in accordance with the provisions of the compact and Comprehensive Plan, are exempt from taxation."

 Accepting the fact that a tax exemption is provided for, the city nevertheless urges before us that property owned by a public body, such as the Port Authority, cannot, under our Constitution, be rendered tax exempt solely because of the status of the owner, but an exemption exists only if the property is devoted to a public use. It urges, therefore, that the tax exemption accorded the Port Authority under the "in-lieu-of" tax statute is unconstitutional, inasmuch as the exemption would apply to any inland terminal property owned by the Port Authority, irrespective of whether the property is in public use.

The cornerstone of the city's argument is our decision in *New Jersey Turnpike Authority v. Washington Twp.*, 16 *N. J.* 38 (1954). There the Turnpike Authority had acquired land which it was not going to use in the future for turnpike purposes but which it intended to dispose of as soon as it could. The Township of Washington levied an assessment on the land and the Turnpike Authority sought to set it aside. The Turnpike Authority's enabling act provided an exemption for "property acquired or used by the Authority under the provisions of this act." *N. J. S. A.* 27:23–12. But we held the exemption must, in order to satisfy constitutional standards, be construed as providing an exemption only for property acquired and used by the Authority. We said, speaking through Chief Justice Vanderbilt (16 *N. J.*, at *page* 45) :

"It [the tax exemption] applies to property acquired for turnpike purposes and, having been so acquired, used for such purposes, or held with the present design to devote it within a reasonable length of time to such use ＊ ＊ ＊."

As in the *Washington Township* case, we think it evident that the tax exemption afforded by the "in-lieu-of" tax statute pertains only to property owned by the Port Authority and presently used for Port Authority purposes, "or held with the present design to devote it within a reasonable

length of time to such use." Thus, confining the tax exemption before us within New Jersey's constitutional limits, the question is posed whether the status of Inland Terminal No. 3 during the years 1952 and 1953 was such as to destroy its exemption under the principles settled by this court in the *Washington Township* case, *supra*.

It may be true, as the city urges, that were the Port of New York Authority a private owner of land, the fact that it was leasing its property to the Air Force would not render the property tax exempt. From this analogy, however, it does not follow that the Port Authority's leasing of the inland terminal to the Air Force destroyed its tax exemption. For here the question is different; the property is owned by a public body and concededly it is tax exempt if devoted to a public use. The real question is whether the public use must be the precise public use envisioned when the facility was constructed or whether it can be a public use similar to the intended use.

The Air Force is in fact using Inland Terminal No. 3 in a manner which is closely akin to that originally intended for the building, *i. e.*, a terminal facility for the shipment of freight. The only important difference between the Air Force's use and that originally contemplated is that an agency of the United States Government is using the facility to the exclusion of the general public.

However, from the record before us and the statutory enactment involved, it is quite clear that one of the foremost considerations in the minds of the respective Legislatures when they created the Port of New York Authority and adopted the Comprehensive Plan was the development and maintenance of the Port so that it could be used efficiently by our armed forces in time of war. In recommending to the Legislatures the creation of the Port of New York Authority, the Joint Report of the New York, New Jersey Port and Harbor Development Commission stated:

"When our troops were sent overseas shortly after the United States entered the war [World War I], supplies were rushed to the Port in such quantities as to produce congestion, which not only

delayed the transports but also resulted in their carrying only partial loads—and this at a time when the need for shipping was so great. This condition and the accompanying confusion were due primarily to a lack of proper organization of the Port. There was no coordination of the existing terminal facilities, no unified control of any of the other elements of the harbor—piers, storage facilities, tugs, floats and lighters. Incidentally, it may be remarked that this condition existed at all of the ports of the Atlantic coast, but it was especially noticeable at the Port of New York because of the vast amount of supplies that were shipped to it and that originated within its limits. * * *

In other words, the Port did not function in time of war, nor could it do so efficiently, until an adequate port authority was established. The Commission again emphasizes the necessity for such an authority and for the adoption of the compact between the States of New York and New Jersey which will make possible its creation. Such an instrumentality will meet the commercial needs in times of peace and will assist the Federal authorities in giving proper protection in times of war."

Under the circumstances presented here, the Air Force's use of Inland Terminal No. 3 was entirely consistent with the original understanding of the purposes to be served by the various projects owned and operated by the Port of New York Authority. For, during the years in question and at the time the lease to the Air Force was executed, the United States was engaged in an active military contest in Korea. The United States Air Force, as appears from the record before us, vitally needed Port Newark and facilities owned by the Port Authority, including Inland Terminal No. 3, for its operations in the war effort. Additionally, the Authority, according to the record before us, was making no profit on the transaction as the rental paid under the lease affected is only equal to the debt service and fixed charges. We conclude, therefore, that such use of Inland Terminal No. 3 by the Air Force was a public use justifying the continuation of the property's tax exempt status for the years in question.

Further, we are in accord with the conclusion of the trial court below that Inland Terminal No. 3 is being held by the Port Authority "with the present design to devote it within a reasonable length of time to such use." There is no evidence to show that the Port Authority has abandoned

its original intent to use Inland Terminal No. 3 as a union motor truck terminal. That such is not the case clearly appears from the numerous statements which representatives of the Port Authority have made and the current effort which it is making to have the 5,000-pound limitation contained in Local 478's contracts removed. Further evidence of the Port Authority's intent may be gathered from the fact that under its lease with the Air Force specific provision was made for the maintenance and safeguarding of equipment presently in the building which will be needed for the future operation of a motor truck terminal.

The fact that operation of the terminal is or may be presently economically impossible by virtue of the union contract does not vitiate either the Port Authority's intent or the tax exemption. It may well be that if it subsequently appears the Authority is not devoting the terminal to a public use and is not contemplating doing so, a court would be justified in holding that the future possible public use in mind is too speculative to warrant a continuation of tax exemption, but we are not assaying an adjudication *in futuro*.

On the issue before us, we are satisfied the property is exempt for the reasons expressed.

The judgment below is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.