103 N.J. Super. 41 (1968)
246 A.2d 509
THE CITY OF NEWARK AND THE PORT OF NEW YORK AUTHORITY, PLAINTIFFS,
v.
THE ESSEX COUNTY BOARD OF TAXATION, DEFENDANT, AND TOWN OF BELLEVILLE, ET AL., INTERVENING DEFENDANTS.
Superior Court of New Jersey, Law Division.
Argued May 10, 1968.
Decided June 26, 1968.
*44 Mr. Norman N. Schiff for plaintiff, The City of Newark.
Mr. Francis A. Mulhern, Solicitor, for plaintiff, The Port of New York Authority (Mr. Sidney Goldstein, General Counsel, of the New York bar, of counsel).
*45 Mr. Charles H. Landesman, Deputy Attorney General, for defendant, The Essex County Board of Taxation (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
Mr. Saul A. Wolfe for Intervening Defendants (Messrs. Skoloff & Wolfe, attorneys).
LARNER, J.S.C.
This action was instituted by the Port of New York Authority (hereinafter port authority) for a declaratory judgment that certain lands and buildings leased by the City of Newark (hereinafter city) to the port authority in the Port Newark area are exempt from local taxation. The city did not ally itself with the position of the port authority, but joined as a party plaintiff for the purpose of achieving a determinative resolution of the issue by judicial declaration.
The particular focus of this litigation is the action of the Essex County Board of Taxation in the form of a resolution dated January 1967 removing the properties in question from the exempt rolls and directing the city to include them in the tax lists for the tax year of 1967.
The Essex County Board of Taxation contends that the properties and their use are not such as to warrant tax exempt status and that the county's share of the city's taxes should be increased accordingly.
All the other municipalities of the County of Essex have intervened in the action by permission of the court in view of their financial interest in the controversy, contending that the properties should be assessable for taxation and that the exemption from taxation would increase their tax burden to the county.

BACKGROUND HISTORY
Although the issues before the court involve only the determination of taxability for the year 1967, it is important to note the history of the relationship between the city and port authority and their involvement in this tax controversy in past years.
*46 Plans for the development of a marine terminal on Newark Bay date back to the beginning of this century, with study commission reports and legislation leading to public ownership and operation of marine terminals. L. 1911, c. 161; New Jersey Harbor Commission, Fourth Preliminary Report (1914) p. 184-188; L. 1916, c. 162; R.S. 40:179-58 et seq.; L. 1917, c. 127; R.S. 40:179-46 et seq.; L. 1920, c. 176, R.S. 40:179-34 et seq.
Pursuant to the authority of the foregoing legislation, the City of Newark developed the marine terminal complex in the Port Newark area, covering approximately 700 acres, including the leasing of docks, lands and buildings to private concerns.
In the interim, New Jersey and New York entered into an interstate compact pursuant to Congressional authority, establishing the Port of New York District and creating the Port of New York Authority as the bi-state agency for the purpose of developing the port district. N.J.S.A. 32:1-2 et seq.
In 1945, the City of Newark requested the port authority to undertake a study of all matters relating to Port Newark and Newark Airport for the purpose of considering the possibility of the port authority undertaking the management and administration. As a result of such a study legislation was adopted in 1947 authorizing the cooperation between the port authority and municipalities in the development of marine terminals. N.J.S.A. 32:1-35.28 et seq. Parallel legislation was adopted in the State of New York. N.Y. UNCONSOL. LAWS, § 6671 et seq. (McKinney 1948). Under this legislation, municipalities were empowered "to consent to the use by the port authority of any marine terminal owned by such municipality * * * [and] to grant, convey, lease or otherwise transfer to the port authority any such marine terminal or real or personal property upon such terms as may be determined by the port authority and such municipality." N.J.S.A. 32:1-35.31. In addition, every municipality was also authorized "to vest in the Port Authority *47 the control, operation, maintenance * * * of any marine terminal now owned by such municipality." Id.
Instead of conveying the marine terminal properties to the port authority or retaining the port authority as a managing agent of the marine terminal within the ambit of the foregoing legislative authorization, the city entered into a lease agreement with the port authority on October 22, 1947 demising certain premises for a term of 50 years for marine and air terminal purposes. Under this lease, which carried a basic rental of $128,000 per year, the port authority assumed all the existing leases theretofore made by the city, and was authorized to sublet parts of the demised premises for the stated marine and air terminal purposes. Since entering into possession, the port authority has sublet most of the properties involved in the leasehold to private concerns, and that is the factual pattern which existed on October 1, 1966, the key assessment date for the tax year of 1967.
In 1960, the city concluded that certain of the demised premises were not being used for air and marine terminal purposes and should be subject to ordinary taxation. It therefore applied to the Essex County Board of Taxation to list these properties on the tax rolls as omitted assessments. The same approach applied to the tax years of 1961, 1962, 1963, 1964 and 1965. The Essex County Board determined that the property should be assessed with the port authority listed as "Owner".
This determination inspired appeals to the appellate division and suits in the law and chancery divisions of the Superior Court, which became so "snarled procedurally" that the Supreme Court finally took jurisdiction of all aspects of the complex litigation and remanded the matter to the law division to hear de novo all the issues involved in the entire controversy. Port of New York Authority v. Essex County Board of Taxation, 46 N.J. 51 (1965).
Subsequent to the remand and pending the trial in the law division, the city and the port authority effected a settlement of their differences involving the tax years from 1960 *48 to 1965 inclusive by entering into the "Ninth Supplemental Agreement with Respect to the Newark Marine and Air Terminals," dated December 14, 1966. As part of the settlement agreement, the annual rental was increased from $128,000 to $1,000,000, with a provision for additional rental using a formula based upon a computation of the net revenue of the port authority.
Among other provisions relating to advance payments and retroactive rent for 1966, the agreement provided:
"In the event the City or the Port Authority, or both, under any law that may hereafter be enacted or applied, shall be or become subject to and liable for payment to the county in which the demised premises are located of any taxes, assessments or governmental levies or imposts upon or against the demised premises or upon any part or parts thereof then, as between the City and the Port Authority, the Port Authority shall pay the same and such payment by the Port Authority shall be included in the operation and maintenace expense."
It was also stipulated that all litigation pending between the parties would be dismissed with prejudice and that the city would designate on its tax records that all the properties involved in the leasehold are tax exempt.
The agreement went into effect, the prior litigation was dismissed, and the City marked the properties exempt on its tax roles. On a review of the assessments of the city for the taxable year 1967, the Essex County Board of Taxation set aside the exemption and directed that the city restore the demised properties to its tax rolls. The city complied with this directive and thereafter the present suit was brought for declaratory judgment relating to the taxability of the affected properties for the year of 1967. The determination of the taxability of the property in the context of this litigation is a mixed question of law and fact, involving the exploration and delineation of the controlling legal guidelines and the application of those guidelines to the specific properties according to their function and use. It is therefore advisable to discuss first the legal principles which must be applied to the factual patterns revealed by the evidence.

*49 LEGAL PRINCIPLES
Preliminarily, the court will dispose of the contention made by the defendants that the port authority does not have the standing to bring this action. It is urged that the authority is not the owner of the properties involved and that the tax assessment ordered by the Essex County Board of Taxation is against the ownership interest of the city and not the leasehold interest of the port authority as authorized by N.J.S.A. 54:4-2.3; and that as a consequence the port authority has no right to relief. Although the Authority is not the owner of the properties involved, it has a substantial financial stake in the taxability of the properties through its obligations under the lease with the city; and as a result has the requisite standing to seek declaratory relief. N.J.S. 2A:16-56. See Port of New York Authority v. Essex County Board of Taxation, 46 N.J. 51, 53 (1965); Bergen County v. Port of New York Authority, 32 N.J. 303, 307 (1960).
Any discussion of the taxability of property in the State of New Jersey must commence with the basic legislative mandate that "all property, real and personal, within the jurisdiction of this state not expressly exempted from taxation * * * shall be subject to taxation." N.J.S.A. 54:4-1. The fundamental question therefore is whether or not the properties in question are expressly exempt from taxation.
Initially, it is clear that the legislature has not granted a specific exemption from local property taxation for property owned or used by the port authority as a marine terminal by any of the provisions of the 1947 enabling legislation. (N.J.S.A. 32:1-35.28 et seq.).
The port authority however points to the provisions of N.J.S.A. 32:1-144 as a basis for tax exemption:
"To the end that * * * cities * * * in the Port of New York District, may not suffer undue loss of taxes and assessments by reason of the acquisition and ownership of property therein by the Port of New York Authority * * * the port authority is hereby authorized and empowered, in its discretion, to enter into a voluntary *50 agreement or agreements with any * * * city * * * in said port district, whereby it will undertake to pay a fair and reasonable sum or sums annually in connection with any marine or inland terminal property owned by it, not in excess of the sum last paid as taxes upon such property prior to the time of its acquisition by the port authority."
The authority cites the cases of Port of New York Authority v. City of Newark, 20 N.J. 386, 393 (1956) and Bush Terminal Co. v. City of New York, et al., 282 N.Y. 306, 26 N.E.2d 269 (1940) as authority for the contention that the section impliedly grants a tax exemption to property owned and used by the port authority for marine terminal purposes, since the legislature in passing this section must necessarily have assumed that such property was exempt from taxation.
It is true that where the facts bring into play the "in lieu of" tax statute, the courts of last resort of the States of New York and New Jersey have held that their respective legislatures impliedly intended to grant tax exemption to the port authority despite the absence of a specific exemption in the legislation. Port of New York Authority v. City of Newark, supra; Bush Terminal Co. v. City of New York, supra.
These precedents, however, are distinguishable from the present case in two respects. First, the Essex County Board of Taxation did not direct that the property be assessed to the port authority; and second, the ownership of the property in question is not in the port authority, which is a prerequisite of the application of the "in lieu" statute. N.J.S.A. 32:1-144. Hence, it is the conclusion of this court that the reasoning of the foregoing cases cannot serve as a basis for exemption of properties owned by the city and leased to the port authority. This avenue of tax exemption by statutory implication from N.J.S.A. 32:1-144 is not available to the city in the context of the facts herein.
Another basis of exemption advanced by the port authority is the provision of R.S. 40:179-42 which states:
"Every industrial terminal, and also all additions, extensions and improvements thereof, erected pursuant to the terms of this act, and every interest or estate therein, except personal property of any *51 tenant or lessee shall, during the term of any lease thereof made as herein provided, be exempt from all taxes and assessments within this state." (Emphasis supplied.)
This section of the statute was part of the comprehensive legislation passed in 1920 authorizing any city fronting upon navigable waters to establish an industrial terminal including docks, warehouses, ferries, terminals and shipping and industrial facilities, and to acquire lands for said purpose. It is urged that since the properties involved in this litigation were initially operated by the city pursuant to R.S. 40:179-34 prior to the time when port authority went into possession under its lease and since the provisions of R.S. 40:179-35 expressly permit a city to lease the industrial terminal facility for a term not exceeding fifty years, the tax exemption provided by R.S. 40:179-42 should apply to the port authority.
An analysis of this legislation involving industrial terminals reveals that it is not the applicable statute which controls the operation of the marine terminal in port Newark since 1947. It was the legislation under which the port was operated by the city between 1920 and 1947. However, when the city relinquished possession and control to the Port Authority by the lease of 1947, it did so pursuant to the legislation adopted for the very purpose of authorizing the arrangement between the city and the port authority, namely N.J.S.A. 32:1-35.28 et seq. See Port of New York Authority v. Hackensack Water Co., 41 N.J. 90, 95.
Any doubt as to the identification of the enabling legislation which controls the operation of the port by the port authority was resolved by the parties themselves in their original lease arrangement in the following language:
"WHEREAS, by the Treaty of April 30, 1921, creating the Port of New York Authority, the two said states granted to the Port Authority full power and authority to purchase, construct, lease and operate marine terminals within the Port of New York District and by Chapters Forty-four [N.J.S.A. 32:1-35.28, et seq.] and Six Hundred and Thirty-one, respectively, of the Laws of New Jersey and the Laws of New York of 1947, said two states have authorized and empowered cities and other municipalities in the *52 Port of New York District to cooperate with the Port Authority in the development of marine terminals and to consent to the use by the Port Authority of marine terminals owned by them and of any real and personal property owned by them, * * *."
In Section I, Definitions, the following also appears:
"`Marine Terminal' and `Newark Marine Terminal' shall mean a Marine Terminal as defined in Section Three of Chapter Forty-four of the Laws of New Jersey of 1947, [N.J.S.A. 32:1-35.20] * * *."
By the foregoing, the city and the port authority acknowledged in 1947 that the operation of the port by the port authority was accomplished pursuant to the authority and terms of the recently adopted legislation, namely Chapter 44 of the Laws of 1947 (N.J.S.A. 32:1-35.28 et seq.) and not the pre-existing legislation adopted in 1920 consisting of Chapter 176 of the Laws of 1920 (R.S. 40:179-34 et seq.) Hence the exemption set forth in R.S. 40:179-42 which by its terms is limited to industrial terminals erected pursuant to the 1920 legislation is not applicable to the current operation of the port by the port authority, and cannot serve as the basis of statutory exemption claimed by the authority.
The port authority advances as a final ground of tax exemption the provision of N.J.S.A. 54:4-3.3 which exempts from taxation the property of taxing districts used for "public purposes." It is clear that property owned by a municipality, as is the case here, is exempt from taxation, if and only if that property is used for "public purposes." Jamouneau v. Division of Tax Appeals, 2 N.J. 325 (1949); Teaneck Township v. Division of Tax Appeals, 10 N.J. Super. 171 (App. Div. 1950). In fact, public use is a necessary prerequisite in order to bring publicly owned property within constitutional standards for tax exemption. New Jersey Turnpike Authority v. Washington Township, 16 N.J. 38, 44 (1954); Const. Art. VIII, Sec. 1, par. 1. Since the statute requires both public ownership and public use to qualify the property for tax exemption, the mere receipt of rentals from a private lessee with financial benefits to the *53 public agency does not transform a private use into a public use. Jamouneau v. Division of Tax Appeals, supra, 2 N.J., at p. 333. As observed by Justice Francis in Borough of Moonachie v. Port of New York Authority, 38 N.J. 414, (1962):
"[P]roperty owned by a public agency but employed primarily to obtain revenue or profit through private business uses is not immune from taxation, but property employed primarily for a public use does not lose immunity because the agency incidentally derives some private business income from it." (at p. 426)
Although tax exemptions sought by private owners are strictly construed and will not be extended beyond the ascertainable intention of the Legislature, Deubel v. Kervick, 33 N.J. 568, 574 (1960), our courts have adopted a more liberal attitude toward tax exemptions sought by governmental agencies. Walter Reade, Inc. v. Dennis Township, 36 N.J. 435, 440 (1962); Township of Hanover v. Town of Morristown, 4 N.J. Super. 22, 24 (App. Div. 1949). In cases involving governmental agencies, the requisite of use for public purpose is accorded a liberal construction  one reasonably broad to encompass the legislative aims. Id.
This so-called liberal construction however must be tempered by a countervailing policy consideration dictated by the increasing removal of real property by public agencies from the tax rolls of local governments. In Moonachie, supra, the Supreme Court pointed out:
"Recent years have witnessed also a steadily increasing taking of private property by both state and federal governments and various agencies thereof for public purposes, thus removing it from the tax rolls and casting a proportionately greater share of support of state and local government upon the private property owner. * * * Exemption of industrial property from taxation or its removal from tax rolls causes a particularly severe impact upon local government. Such property is a vital part of the tax base in most communities since the tax revenue derived from it, as distinguished from residential property, usually greatly exceeds the cost of providing local public services. And it may be said that there are no substantial differences, either in the nature of their activity or in the economic effects upon local communities, between privately owned industrial plants, and buildings owned by the Port Authority and leased for *54 industrial operations unrelated to air terminal purposes." (38 N.J., at p. 423)
The severe impact of such public agency encroachment upon the tax structures of our municipalities requires a form of braking action by our courts so as to permit exemptions only for such uses as are clearly within the intendment by the legislature.
Thus, the applicable guideline is whether the uses made of the involved properties as of October 1, 1966 were true public uses within the intent of the Legislature when it authorized the City of Newark to lease to the port authority the Port Newark complex for the development of a marine terminal.
The intervening municipalities of Essex County urge that the use of the properties for marine terminal purposes, even within the legislative authorization, is not equated with "public use" as required by N.J.S.A. 54:4-3.3. The port authority contends that the properties in question are being used for a public purpose since they are being used as a marine terminal pursuant to N.J.S.A. 32:1-35.28 et seq. The other parties concede that a marine terminal is a public use and that the ultimate issue presented by this litigation is whether the properties are used for marine terminal purposes.
It is manifest from the legislation authorizing the development of air terminals (N.J.S.A. 32:1-35.1 to 32:1-35.19) and marine terminals (N.J.S.A. 32:1-35.28 to 32:1-35.36) and the history leading to this legislation that the legislature of our state mandated that the use of property by the port authority for the purposes defined therein constitutes a public use. See Port of New York Authority v. City of Newark, 20 N.J. 386 (1956). Moreover, the Supreme Court in Port of New York Authority v. Hackensack Water Co., 41 N.J. 90 (1963) referred to the Port Newark operation as follows:
"Two small items here involved relate to the Port Newark Marine Terminal, operated by the Port Authority under a lease from its *55 owner, the City of Newark, pursuant to legislation of the States of which the New Jersey counterpart is N.J.S.A. 32:1-35.28 et seq. These terminal facilities are in the public use." (Emphasis supplied). (at p. 95)
As a consequence, there is no doubt that a "marine terminal" purpose is also a "public purpose"; and that properties at Port Newark operated by the port authority under its lease with the City which are used for marine terminal purposes are tax exempt. Conversely, such properties which are not used for "marine terminal" purposes are subject to ordinary taxation, regardless of public ownership by the City and public operation by the port authority.
It is also manifest that these consequences follow regardless of the fact that the properties may be sub-let by the port authority to private concerns. It is the use and purpose which control within the framework of the public ownership in this case, and not the identity of the particular individual or corporation carrying out that purpose under lease or sublease from the city. Port of New York Authority v. City of Newark, supra, 20 N.J., at p. 395; Walter Reade, Inc. v. Dennis Township, supra; Town of Bloomfield v. Division of Tax Appeals, 84 N.J. Super. 19 (App. Div. 1964).
There thus remains for consideration the nature, type and extent of the business activities which are encompassed within the designation "marine terminal", in order to test the taxability of the particular property uses reflected by the evidence.
The statutory definition of a marine terminal is that contained in the Marine Terminal Act (N.J.S.A. 32:1-35.28 et seq.) which authorized the agreement between the city and the port authority, and which was incorporated by reference in the lease of October 22, 1947. N.J.S.A. 32:1-35.30 provides in pertinent part:
"`Marine terminals' shall mean developments, consisting of one or more piers, wharves, docks, bulkheads, slips, basins, vehicular roadways, railroad connections, side tracks, sidings or other buildings, structures, facilities or improvements, necessary or convenient *56 to the accommodation of steamships or other vessels and their cargoes or passengers.
"`Marine terminal purposes' shall mean the effectuation, establishment, acquisition, construction, rehabilitation, improvement, maintenance or operation of marine terminals."
A further relevant definition appears in the basic compact between the States of New York and New Jersey which created the Port of New York Authority. N.J.S.A. 32: 1-23 provides in pertinent part:
"`Terminal facility' shall include wharves, piers, slips, ferries, docks, dry docks, bulkheads, dockwalls, basins, carfloats, floatbridges, grain or other storage elevators, warehouses, cold storage, tracks, yards, sheds, switches, connections, overhead appliances, and every kind of terminal or storage facility now in use or hereafter designed for use for the handling, storage, loading or unloading of freight at steamship * * * terminals."
In the "Principles to Govern the Development" of the Port of New York, the Legislature proclaimed: (N.J.S.A. 32:1-26)
"First  That terminal operations within the Port district, so far as economically practical, should be unified;
"Second  That there should be consolidation of shipments at proper classification points, so as to eliminate duplication of effort, inefficient loading of equipment, and realize reduction in expenses."
It is evident that the legislative design contemplated that the port authority would develop the port for the substantial benefit of the surrounding communities and their citizens; and that all activities reasonably necessary for the operation of a marine terminal would properly represent public uses.
It is also evident that the operations encompassed by the statutory definition of a marine terminal involve lands, structures and buildings utilized in the flow and movement of water-borne cargoes and passengers. And this includes not only the usual land accoutrements for shipping, such as piers, docks, wharves, railroad connections, sidings, etc., but also such "buildings, structures, facilities or improvements, necessary or convenient to the accommodation of steamships or other vessels and their cargoes or passengers."
*57 The permissible uses should be construed broadly in order to effectuate the basic purposes of the Bi-State Compact and the creation of the port authority, N.J.S.A. 32:1-35.32. However, such liberal construction can only be exercised within the limits of the statutory definition of the activities and functions of a marine terminal, which have as their common denominator the accommodation to the flow and movement of water-borne cargoes and passengers. Thus, even if the land, building or structure is not used for one of the enumerated purposes, it is nevertheless within the authorized uses if it is reasonably necessary or convenient for the efficient operation of a marine terminal. In re Township of Moon, 387 Pa. 144, 127 A.2d, 361, 364 (1956). However, unless the use is one which is convenient or necessary for the operation of a marine terminal as a public instrumentality, it cannot qualify as a public use for tax exemption despite its incidental benefit to the public and to the public agency. Town of Harrison v. County of Westchester, 13 N.Y.2d 258, 246 N.Y.S.2d 593, 196 N.E.2d 240 (1963); Borough of Moonachie v. Port of New York Authority, supra.
The evidence reveals that the uses of the involved properties are mainly concerned with water-borne imports and exports, which fall into the following general functional categories: (1) transit functions, temporary storage, and supporting services; (2) warehousing; (3) sales and delivery of merchandise; (4) processing and manufacturing. In addition, there are some uses which cannot be categorized and which must be analyzed on an individual basis.
In any event, the major areas of dispute arise with properties which are utilized by private companies under sublease from the port authority for the conduct of ordinary business activities involving the sale and delivery of goods to customers, warehousing of goods, and the processing and manufacturing of products.
The port authority contends that the uses of the properties in October 1966 were substantially the same uses which *58 existed in October 1947 when the port authority entered into the lease with the city; and that as a result thereof, the court should declare such uses to be encompassed within the definition of "marine terminal." It urges that the legislature adopted the enabling legislation (N.J.S.A. 32:1-35.28 et seq.) in apparent recognition of the existing facilities and uses in the Port Newark complex operated by the city and that it thereby sanctioned the continuation of those uses as part and parcel of a marine terminal by the port authority under its contemplated lease with the city.
Such an argument presupposes that the legislation in question applies by its terms solely to the port of the city of Newark and that the statute is a special one for that city and its peculiar characteristics and problems. Although the impending lease with the City of Newark may have inspired the passage of the legislation, by its terms the statute applies to all municipalities within the Port of New York District. The statute does not purport in express language to equate the status quo of property uses in the City of Newark with the permissible uses of a marine terminal. It rather defines in explicit terms the meaning of a marine terminal.
It is the duty of this court to construe the legislative intent within the limitation of the terminology utilized in the finalized text of the statute, and not within conjectural assertions as to the unexpressed intentions of the legislators when the statute was adopted. Petrangeli v. Barrett, 33 N.J. Super. 378, 386 (App. Div. 1954); Dumont Lowden, Inc. v. Hansen, 38 N.J. 49, 56 (1962).
Hence the court in passing upon the current property uses on October 1, 1966 is not controlled or persuaded by the nature of the uses in 1947. Neither the legislature by statute nor a court by judicial determination has frozen the definition of marine terminals to the existing uses during the period pre-existing the port authority lease. The court must make independent findings based upon the factual *59 pattern of 1966, as controlled by the statutory definition of marine terminals.
In a further effort to expand the ambit of functions and uses involved in the operation of a marine terminal, the port authority offered testimony of two experts, trained and experienced in the management and operation of ports and marine terminals. One of these experts, Albert Lyle King, an employee of the port authority, offered his own definition of a marine terminal as follows:
"A marine terminal, in my concept, is a complex of wharves, warehouses, open land and miscellaneous buildings for the purpose of generating and transferring cargo between land and water carriers and providing facilities for servicing, processing and distributing cargo."
By this definition as elaborated by his other testimony, Mr. King took the position that one of the important goals of the authority in the operation of the Newark Marine Terminal is to generate shipping business by attracting companies to the port area who are engaged in export and import activities. He asserted that such concerns should be considered part of a marine terminal and permitted to operate within the leased area of the port in order to compete with ports of other cities such as Philadelphia and Baltimore. It was his conception that these businesses should be located in the port and therefore properly within the operation of a marine terminal so that the port may develop into a bustling trade center which would in turn generate substantial shipping activity. It is for that reason that he included in his definition of a marine terminal the use of land and buildings for the purpose of generating cargo.
It was also because of this approach that the expert included within the definition of a marine terminal, uses involving the processing of fabricating of goods. It was his opinion that such an industrial activity is properly a marine terminal purpose so long as the goods are placed in water-borne commerce through importation or exportation. He also concluded that concerns engaged in the export and import *60 business selling merchandise which is water-borne qualify as appropriate users of port properties within the limits of a marine terminal.
There is no doubt that the basic goals and motives of this expert and his employer, the port authority, are laudable from the viewpoint of the business development of the Port and the economic welfare of the city. These goals however are not the controlling test of taxability. They may be efficient and profitable standards for the development of a marine terminal when unhampered and unlimited by legislative controls. However, the desires and goals of the port authority in its ever-expanding activities cannot run counter to the legislative mandate. Definitions of the port authority or its experts based upon their best business judgment are of no legal significance on the issues at hand, which must be tested by the limitations of the statutory definition and not by the business judgment of the port authority executives and experts.
It is therefore incumbent upon the court to control the expansion of port authority activities via the route of tax exemption by limiting this extraordinary privilege only to those uses and purposes which are clearly within the legislative intendment. Public use is not synonymous with port authority use; it is synonymous with the uses designated by the legislature for a marine terminal.
Based upon this standard of legislative construction, which of the properties involved come within the statutory requirement that a marine terminal encompasses buildings, structures and facilities "necessary or convenient to the accommodation of steamships or other vessels and their cargoes or passengers"? The evidence of the uses and purposes of the particular properties on October 1, 1966 is not in substantial dispute. As far as possible, it would be appropriate to consider the specific properties in the applicable classes of the functional categories outlined above.
[The court proceeds to consider the taxability of each of the involved properties within the functional categories set *61 forth supra. Generally, the court arrives at the following conclusions:
1. Properties used for transit functions, temporary storage and supporting services are exempt from taxation.
2. Properties used for general warehousing are taxable.
3. Properties used for sales and delivery of merchandise are taxable.
4. Properties used for processing and manufacturing are taxable.
5. Miscellaneous properties  some taxable, some exempt (as set out in filed opinion).]