HOPKINS, J.T.C.
This is a consolidated appeal from local property tax assessments for the years 1980 and 1981 applicable to Block 1810, Lot 9 in the taxing district of Village of Ridgewood and for 1980 *394 with respect to Block 7, Lot 8 in the taxing district of Borough of Midland Park.
The following schedule shows the assessments for each of the properties for the years involved together with the county board judgment values.
Block 1810, Lot 9 (Ridgewood)
Year Assessment County Board Judgment
1980 $21,200 $1,000
1981 21,000 1,000
Block 7, Lot 8 (Midland Park)
1980 $25,400 $1,000
The property is composed of contiguous lots which are divided by the municipal boundary line between Midland Park and Ridgewood. Containing approximately 1.62 acres in Midland Park and 1.16 acres in Ridgewood, it is irregularly shaped and is accessed over a 22-foot wide right of way that originates on Erie Avenue in Midland Park. The right of way has a depth of 130 feet until it reaches the westerly boundary of the subject site. Erie Avenue is a fully improved street and all utilities including sanitary-sewer service are available from that roadway. The property also has potential access over contiguous property located in Midland Park designated as Block 7, Lot 1, which property is owned by David and Dorothy Bolger (Bolgers), the officers and trustees of the owner of the subject property, Bolger Foundation (Foundation). The Ridgewood portion of the property has 142 feet of frontage along Elm Court in Ridgewood, a paper street at this time. The prospect for access from the Ridgewood side is remote. The property is wooded with mature, deciduous trees and declines gradually toward, the east. Located in a residential zone, it is in a neighborhood of high priced homes on oversized lots in Ridge-wood. The Midland Park part of the neighborhood features well-kept single-family homes.
Midland Park and Ridgewood are Bergen County communities located in the northwestern section of Bergen County. Midland Park is the smaller of the two, having an area of 1.69 *395 square miles with a population of approximately 7,500. Ridge-wood contains almost six square miles with a population of approximately 25,000 persons. Both communities are primarily residential in character.
In valuing the lots, the valuation expert for the taxing districts did not give any weight to an agreement which Foundation had entered into with the Village of Ridgewood, under date of August 22,1978, authorizing use of the property for the purpose of drilling a test-water well. He also did not give any consideration to a “conservation easement” which taxpayer had granted to the New Jersey Conservation Foundation (NJCF). Taxpayer’s expert took both the license and the easement into consideration in valuing the Ridgewood lot.
Bolgers purchased the subject property as part of a larger tract in 1969. They subsequently sold off that portion designated as Block 1810, Lot 19 in Ridgewood. On December 22, 1969, Bolgers conveyed the subject property to Foundation in fee simple, at which time it was valued at $30,000. Foundation had been incorporated in 1964 as a private, nonprofit corporation by the Bolgers and Bradford S. McGill, now deceased. The Bolgers now serve as Foundation’s only officers and trustees. The Bolger family residence is situated on a plot composed of four lots. The rear portion of that plot is adjacent to residential property which the Bolgers own and lease. That property, in turn, is contiguous with the Midland Park portion of the subject property.
On August 2, 1978, Foundation granted a license to the Village of Ridgewood whereby Ridgewood was permitted to enter the land and conduct drilling tests to determine the feasibility of a water well. That license was to continue until such time as the tests had been completed and notice given to Foundation, or one year from the date of the agreement, whichever occurred first.
On August 15, 1979, Foundation granted a conservation easement to NJCF. It provided that it was to be a perpetual easement and that should the grantee cease to function, it was *396 to be assigned to a similar nonprofit conservation organization. The essential provisions precluded removal of vegetation, except in a manner consistent with accepted conservation practices; precluded excavation or removal of topsoil, sand, gravel, etc., except as agreed to between the parties; precluded erection of buildings or structures except buildings necessary to construct a test-water well and such improvements as may be necessary to permit the operation of a water well by the Village of Ridgewood. It precluded dumping of soil or trash, and there was to be no activity detrimental to drainage or flood control.
While the easement stated it was created for the benefit of the general public, it specifically provided that it was not to be construed to permit the public any right of access or right to use the property. Further, Foundation had the exclusive right of access to and use of the property. NJCF, on the other hand, was to be permitted access at all reasonable times but solely for the purpose of inspection to insure compliance with the terms of the easement.
NJCF is a privately supported, nonprofit, statewide organization which has been devoted to conserving New Jersey’s environment since 1964. In pursuit of that overall goal, it acts to preserve vital open spaces. Further, it does acquire property in conjunction with its overall program and also sells such property when it is deemed that the sale or the proceeds are in furtherance of its goals.
The water-drilling license, by its own terms, expired at least by August 22, 1979, which was prior to the earliest assessment date here involved. Accordingly, it could not have any impact on value.
The environmental easement, however, was in effect as of the assessment dates and its impact upon the assessments must be examined.
N.J.S.A. 54:4-23 provides in pertinent part as follows:
All real property shall be assessed to the person owning the same on October 1 in each year. The assessor shall ascertain the names of the owners of all real property situate in his taxing district, and after examination and inquiry, determine the full and fair value of each parcel of real property situate in the *397 taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments____
In determining full and fair value, it must first be determined what property rights are included. Addressing that point, the court in Koester v. Hunterdon Cty. Bd. of Tax., 79 N.J. 381, 399 A.2d 656 (1979) stated as follows:
N.J.S.A. 54:4-23 directs that each parcel of “real property” be assessed for taxation at its full and fair value. It does not embody any statutory definition but the courts have properly given it expansive meaning in the light of the broad legislative objectives. Thus, the parcel referred to has been held to include the land and its “concomitant improvements”. City of Newark v. W. Milford Tp., Passaic Cty., 9 N.J. 295, 304 [88 A.2d 211] (1952). And the aggregate tax is a lien on the entire fee even where there is separate ownership of the land and the improvement. Crewe Corp. v. Feiler, 28 N.J. 316, 320 [146 A.2d 458] (1958); Becker v. Little Ferry, supra, 126 N.J.L. 338 [19 A.2d 657]. [at 392]
More recently, in Lawrence Associates v. Lawrence Tp., 5 N.J.Tax 481 (Tax Ct.1983), the court stated:
In New Jersey the Legislature has consistently used the term “real property” rather than “real estate” in the statutes dealing with the local tax involved in this proceeding. Local property tax assessments are made each year on all real property in this state not expressly exempted from tax. N.J.S.A. 54:4-1. All real property is assessed to the person owning it on October 1 of the pretax year. N.J.S.A. 54:4-23. Moreover, an assessment must be made on “the full and fair value” of each such parcel of real property. Ibid. This applies irrespective of varied ownership interests; the assessment must be on the value of all interests in the property. Secaucus v. Damsil, Inc., 120 N.J.Super. 470, 295 A.2d 8 (App.Div.1972), certif. den. 62 N.J. 90, 299 A.2d 88 (1972); Merchandise Mart Associates v. Pennsauken, 3 N.J.Tax 275, 282-283 (Tax Ct.1981); Wayne Mall, Inc. v. Wayne Tp., 2 N.J.Tax 1, 19 (Tax Ct.1980). [at 502]
In discussing easements, the above principles have, to a very limited extent, been relaxed. It must, however, be remembered that there are two basic types of easements. An easement appurtenant is created when a right is carved out of one property for the benefit of another. Weber v. Dockray, 2 N.J.Super. 492, 64 A.2d 631 (Ch.Div.1949). In such instances, the market value of the servient estate is lessened, and the value of the dominant estate is increased. Such decrease or increase is then recognized for tax assessment purposes. Lip-man v. Shriver, 51 N.J.Super. 356, 144 A.2d 37 (Law Div.1958); Ehren Realty Co. v. Magna Charta Bldg. & Loan Assn. of *398 Newark, 120 N.J.Eq. 136 (Ch.1936). An easement in gross, however, is not appurtenant to any estate in land and does not belong to any person by virtue of ownership of an estate in other land. It is a mere personal interest in or right to use land of another. Weber v. Dockray, supra. The easement on the subject property is an easement in gross or, more properly, a negative easement in gross as the owner is prohibited from doing something otherwise lawful. Black’s Law Dictionary (5 ed. 1979), at 458.
This court has been made aware of only one New Jersey case in which an easement in gross affected the valuation of real property for local property tax purposes. That case, Englewood Cliffs v. Estate of Allison, 69 N.J.Super. 514, 174 A.2d 631 (App.Div.1961), involved property which, pursuant to the will of William O. Allison, had been maintained by trustees as a park. It was located on top of the Palisades and had been carefully developed for park use with footpaths, benches, a parking area and appropriate landscaping. It was open to the public except during the winter months and no admission was charged. The Borough of Englewood Cliffs assessed Allison Park for local property tax and that assessment was appealed by the trustees. In reversing the Division of Tax Appeals, the court held that the assessment should not include elements of value transferred to the community at large in the form of public rights. It noted that judicial decisions had protected the public rights when the trustees wanted to sell the property. In reaching its conclusion, the court reviewed those New Jersey cases involving easements appurtenant where the servient estate’s value, for local property tax purposes, was determined by taking the easement appurtenant into consideration. It also cited various New York cases in which the assessed valuations took into consideration easements which had been granted to appurtenant fees. It then went on to conclude as follows:
We conclude that it is immaterial for assessment purposes whether the fee owner holds a title subject to a private easement for the benefit of a dominant tenement, a public easement in a dedicated and accepted street, or public rights to use and enjoy a park under a charitable trust. In each case the land has been deprived of an element of value to be subtracted from the value of the fee. *399 Possibility of adding that element in whole or part to other property, as in the ease of a dominant tenement, is not the controlling factor. The assessor’s duty is to determine true value of the property being assessed; he should not include elements of value transferred to other properties or transferred to the community at large in the form of public rights, [at 529, 174 A.2d 631]
The principles expressed in the Allison case were reviewed in In re Appeal of Neptune Tp., 86 N.J.Super. 492, 207 A.2d 330 (App.Div.1965) involving the assessed value of property which the taxpayer had acquired from the township. The deed expressly conditioned that the taxpayer, its successor or assigns, and any lessee could not use or occupy the property for any purpose other than a bathing area; should not receive any profit from the use thereof; could not erect any structure or structures upon the land and premises without the written consent of the grantor and, in the event of a violation of the conditions, the grantee was to forfeit all right and title in the lands. Taxpayer was a nonprofit corporation organized “for purposes necessary or incidental to the improvement of Shark River Hills Beach by its members.” The beach was used as a bathing area by the members who were residents of Shark River Hills Estates.
Taxpayer argued that the assessment should be based on the value as reduced by the restrictions on use contained in the deed of conveyance, and, further, as it owned less than a fee simple in the land, it was not subject to real property taxes.
In rejecting taxpayer’s position, the court pointed out that the Constitution of 1947, Art. VIII, § I, par. 1 provides that property “shall be assessed for taxation under general laws and by uniform rules.” The court also noted that N.J.S.A. 54:4-1 provides that all property not expressly exempt from taxation or expressly excluded from the operation of that chapter, shall be subject to taxation annually and shall be valued and assessed at the taxable value prescribed by law and that N.J.S.A. 54:4-23 provides that all property shall be assessed to the person owning same and that the assessor shall determine the full and fair value of each parcel at such price as it would sell at a fair and bona fide sale by private contract. It then went on to iterate, with approval, the holding of Stack v. Hoboken, *400 45 N.J.Super. 294, 300, 132 A.2d 314 (App.Div.1957) that “[t]he law requires an assessment of the value, not of the purported owner’s title, but of the land.” In meeting taxpayer's argument that the Allison principles were applicable, the court confined the Allison case to facts where the property was being used as a public park and the elements of value in the property had been transferred to the public at large.
The subject environmental easement is far different from the easement involved in the Allison case. Here, Foundation has the exclusive use of the property except that it has conveyed developmental rights and has agreed to maintain the property in its natural state. While these restrictions on the Foundation’s use of the property could have meaning if it attempted to sell its remaining interests in the property, the restrictions have no meaning within the basic principles of local property taxation.
Foundation also argues that the principles expressed in an opinion by the former Division of Tax Appeals support its position. That opinion held that there is a well-established public policy in New Jersey in favor of open space and that such policy should be recognized by reflecting a reduced assessment value for properties which are encumbered with conservation easements. In support of that approach, various legislative enactments which affected local property taxation were detailed, i.e., the Farmland Assessment Act of 1964, N.J.S.A. 54:4-23.1, et seq.; the act concerning exemption from taxation of real property owned by certain nonprofit corporations, which was enacted in 1974, N.J.S.A. 54:4-3.63, et seq.; and the New Jersey Green Acres Land Acquisition Act of 1961, N.J.S.A. 13:8A-1, et seq.
While the various statutes mentioned do evidence a legislative design to give tax relief in certain factual situations, those enactments must be examined in the light of their requirements and governmental regulations. The Farmland Assessment Act, enacted after a constitutional amendment authorizing it, requires that the owner must make timely application for farm *401 land assessment; the land must consist of at least five acres; it must be devoted to agricultural or horticultural use; it must have been devoted for such use for at least two years prior to the tax year in issue; and gross sales from the produce of the land must total at least $500 a year or there must be clear evidence of anticipated yearly gross sales amounting to at least $500 within a reasonable period of time. Further, there is a provision that in the event there is a change in use, there will be a roll-back of assessments so that the land will be taxed as nonfarmland property for the two years prior to the change in use. N.J.S.A. 54:4-23.8. The 1974 act concerning exemption from taxation of real property owned by certain nonprofit corporations grants the exemption to lands and improvements actually and exclusively used for conservation or recreation purposes, owned and maintained or operated for the benefit of the public by a nonprofit corporation or organization and provides that the Commissioner of the Department of Environmental Protection must certify that the real property and the property owner are qualified under the terms of the act. N.J.S.A. 54:4-3.64; emphasis supplied. Further, there is a provision for roll-back taxes when the property ceases to be exempt under the provisions of the act. N.J.S.A. 54:4-3.69. Lastly, the Green Acres Land Acquisition Act was also relied upon since the funds thereunder could be used by the Commissioner of Environmental Protection to “approve grants to assist a local unit to acquire ... an interest or right consisting, in whole or in part, of a restriction on the use of land by others, including owners of other interests therein; such interests or rights sometimes known as a ‘conservation easement’.” N.J.S.A. 13:8A-12. The act, however, defined a “local unit” as a municipality, county or other political subdivision of the state, or any agency thereof. N.J.S.A. 13:8A-3(b).
A review of the various enactments supports the proposition that New Jersey has a declared public policy in favor of preserving as much open space as possible. However, those statutory enactments in effect on the date the subject conservation easement was granted, all contained very specific provi *402 sions as to the manner in which the government would act in acquiring or approving acquisition of open space. Further, there were penalties or required governmental approval before the open space or public use could be abandoned. None of the enactments contain any provision pursuant to which it can be concluded that the statutes in effect when the subject conservation easement was granted were intended to change the established laws of local property taxation as to the manner of valuing property where a conservation easement was acquired by a nongovernmental entity.
It should be noted that the New Jersey Conservation Restriction and Historic Preservation Restriction Act, N.J.S.A. 13:8B-1, et seq., which encompassed conservation easements to nonprofit corporations, became effective on February 5, 1980, which was subsequent to the August 15, 1979 date of the subject easement. That act requires public hearings as well as the approval of the Commissioner of Environmental Protection before the environmental easement can be released. N.J.S.A. 13:8B-5, 6.
Recognizing the issue here involved pertains to a reduction in assessed value as distinguished from total exemption from local property tax, the principles expressed in Moonachie Boro v. Port of N.Y. Authority, 38 N.J. 414, 185 A.2d 207 (1962) are still applicable. The Court there stated:
Traditionally the property tax has been the chief source of revenue of local governments. Recent times have witnessed efforts on the part of state legislatures to relieve somewhat the almost exclusive dependence upon that single source of revenue. But even in those jurisdictions, property taxation still represents the mainstay of local government. Recent years have witnessed also a steadily increasing taking of private property by both state and federal governments and various agencies thereof for public purposes, thus removing it from the tax rolls and casting a proportionately greater share of support of state and local government upon the private property owner, [at 423, 185 A.2d 207]
After quoting much of the above, the court in Newark v. Essex Cty. Bd. Tax, 103 N.J.Super. 41, 246 A.2d 509 (Law Div.1968), a case which involved the exemption from taxation of property leased by Newark to the Port of New York Authority, went on to state that:
*403 The severe impact of such public agency encroachment upon the tax structures of our municipalities requires a form of braking action by our courts so as to permit exemptions only for such uses as are clearly within the intendment by the legislature, [at 54, 246 A.2d 509]
Here, too, it behooves a court to make certain that the municipal tax base is only diminished in accordance with legislative authority. It is inappropriate for an administrative agency or the judiciary to restrict the municipal tax base any further than authorized by legislation.
Since the division’s opinion was not based on specific legislation, nor was it in accordance with the principles of local property taxation, it does not help Foundation’s position.
It is also noted that the subject easement attempted to restrict the alienability of the property so that it could only be transferred by the grantee upon its ceasing to be a nonprofit corporation and then only to certain other nonprofit or public institutions. Such restrictions are unenforceable under the established law of this state. Ross v. Ponemon, 109 N.J.Super. 363, 263 A.2d 195 (Ch.Div.1970); Ierrobino v. Megaro, 108 N.J.Super. 556, 560, 262 A.2d 17 (Ch.Div.1970); White v. White, 105 N.J.Super. 184, 190, 251 A.2d 470 (Ch.Div.1969). A subsequent transfer of the easement to Foundation would result in it once again possessing the entire fee.
It is therefore concluded that the assessed value of the subject property should not take into consideration the easement in gross granted to NJCF.
The taxing districts introduced the testimony of an expert appraiser who valued the land on the basis that it could be improved with a single-family residence with access from Erie Avenue in Midland Park. He further testified that the most appropriate way of valuing the subject property was by the market approach. In so doing, he utilized six sales, four of which were in Ridgewood and two of which were in Midland Park. Foundation’s expert also used the market comparison approach to value and in so doing utilized three sales in Midland Park as well as eight sales in Ridgewood.
*404 Erie Avenue in Midland Park is lined with residential dwellings of varying size, style and price range. The properties are zoned for residential use with the Midland Park ordinance requiring 14,000 square feet. As effective access to the property from Erie Avenue in Midland Park, the lack of frontage would require a variance from that municipality in order to construct a residence. Section 118-30 of the Midland Park zoning ordinance supports the proposition that a variance could be obtained since it provides that:
Any lot or plot as recorded at the time of passage of this chapter that fails to comply with the minimum requirements of this chapter may be used for any use not otherwise prohibited in such district in which it lies, provided that all of the following requirements are complied with:
A. Said lot is in single ownership as defined in this chapter;
B. All yard requirements are complied with, except that where the average lot width is less than its zone district requirements the side yards may be reduced by the percentage that the lot width bears to the zone district requirements; provided, however, no side yards shall be less than six (6) feet.
The above indicates that it would not be difficult to obtain a variance from Midland Park.
N.J.S.A. 54:4-23, insofar as it applies to the subject property, requires that the assessor shall determine the full and fair value of the real property and shall assess it at the value for which it would sell at a fair and bona fide sale by private contract as of the assessing date. In American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983), it is stated that:
The market is the final arbiter of market value. One crucial determinant of value in the market is highest and best use. The market values of land or a site and of an improved property are both estimated under the assumption that potential purchasers will pay prices that reflect their analyses of the most profitable use of the land or the property as improved. The most profitable use assumption tends to produce the highest offering prices. [At 243]
In valuing the Midland Park property, the taxing districts’ expert concluded a value of $40,000 on the basis that the highest and best use was for a single-family residence. Foundation’s expert also conceded that the sales which he used pointed to a value of $40,000 for a Midland Park residential plot. However, he was concerned that the topography limited *405 construction. Further, he believed a more serious aspect was the limited access to the property. Accordingly, he believed that the value of the property would be 25% of the $40,000 or $10,000. The concern with access is more conjectural than real. The access from Erie Avenue is 22 feet wide and would lead to a plot of 2.78 acres. While the topography might require some imagination to develop, it is not undevelopable. It is an area where high-valued single-family residences are common and it would be readily adaptable for such use. Accordingly, as the only basis on which the experts appear to have differed in reaching their respective values of the Midland Park property was on the basis of potential for construction, and access, which factors I consider minimal in the overall view of the property, I agree with the taxing districts’ expert and find that the Midland Park lot has a value of $40,000.
Since the facts show that the Ridgewood property would be landlocked insofar as Ridgewood access would be concerned, its highest and best use would be as additional land attached to the Midland Park location. Foundation’s expert concluded that as the conservation easement precluded development in perpetuity except for the possibility of a water well, the Ridgewood lot was only worth $1,000. As his premises were erroneous, his value conclusion is of little help. However, the taxing districts’ expert relied too heavily on Ridgewood property values in concluding a $25,000 value. Its use can only be supplementary to the lot with the Midland Park access. Following taxing districts’ expert’s theory, but using the Midland Park values, results in this landlocked parcel having a value of $15,000.
Applying, where appropriate, the ratios mandated by Chapter 123 of the Laws of 1973, as amended, the Midland Park lot will be assessed for $37,600 for 1980, and the Ridgewood lot will be assessed for $15,000 for 1980 and $14,400 for 1981.
The Clerk of the Tax Court will enter judgments to the above effect.