ALTHEA MARSHALL, COLLECTOR

*vs.*

INHABITANTS OF TOWN OF BAR HARBOR

Hancock.    Opinion, February 4, 1959.

*Silsby & Silsby,* for plaintiff.

*William Fenton,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, JJ. SIDDALL, J., did not sit.

SULLIVAN, J.    This is a statutory action of debt by the tax collector of the Town of Trenton. R. S., c. 91-A, Sec.

107, as enacted by P. L., 1955, c. 399, Sec. 1. The cause was submitted to a referee with the reservation to the parties of the right to except upon issues of law, to his decision. A hearing was had. The referee reported in favor of the defendant. The plaintiff in writing objected to such report and subsequently excepted to the acceptance of the report by the Justice of the Superior Court. Rule of Court 21, 147 Me. 473. The plaintiff now prosecutes her exceptions.

The defendant, a municipal corporation, was, on the annual tax assessment date of April 1, 1956, the owner of an airport comprised of land and buildings all situated in the Town of Trenton. The land is an area of 350 acres, more or less, and had been obtained by the defendant in various acquisitions during the years 1934, 1941, 1942, 1943 and 1944. During World War II the Navy utilized the airport and erected many of the buildings and supplied much equipment all of which, at the close of hostilities, was given to the defendant by authority of the War Assets Administration with a title somehow conditioned that the buildings and equipment be maintained by the defendant to the end that they might be available for the government again in the event of a national emergency. The airport has been subject to inspection and control by the Civil Aeronautics Administration.

This action seeks to obtain from the defendant a tax of $1110 upon the following assessed items:

| | |
|---|---|
| Hangar | $3800 |
| 1 Snack Bar | 300 |
| 5 Quonset Huts | 500 |
| 2 Garages 100, 200 | 300 |
| 1 Building | 100 |

R. S., c. 91-A, Sec. 10, Par. I, Sub-par. G, as enacted by P. L., 1955, c. 399, Sec. 1, reads as follows:

"Sec. 10. **Exemptions.** The following property and polls are exempt from taxation.

I. Public property.

- - - - - - - - - - - - - - - - - - - -

G. All airports and landing fields and the structures erected thereon or contained therein of public municipal corporations whether located within or without the limits of such public municipal corporations; provided, however, that any structures or land contained within such airport not used for airport or aeronautical purposes shall not be entitled to this exemption; and provided further that any public municipal corporation which is required to pay taxes to another such corporation under this paragraph with respect to any airport or landing field shall be reimbursed by the county wherein the airport is situated."

The above statute became effective on August 20, A. D., 1955.

The record acquaints us with the properties of the airport. There was an administration or terminal building which served as the main offices for the lessees, Bar Harbor Airways, Inc. and Northeast Airlines, with a common lobby and rest rooms. Airways, Inc. had radio equipment and its air control switches there. It there functioned as airport manager, did its bookkeeping, conducted over the counter sales and carried on an air taxi service. It maintained in its office a V H F transreceiver for direct communication from ground to air and from aircraft and thus supplied wind condition, direction and velocity communications for 'planes using the runways. This building was not taxed.

There was a hangar, 90 x 100 feet, primarily for storage of aircraft. On April 1, 1956 some twenty 'planes were housed there. Two were State 'planes; the balance were privately owned. 75% of the 'planes were dead storage in winter. One 'plane was from the flying school. Charges

were made for storage. During the summer of 1956 nine or ten weekly public dances were held there with a net income therefrom of $1000 to $1500 to Bar Harbor Airways, Inc.

There was a building, 30 x 50 feet, occupied by Airways, Inc. as a repair shop for aircraft maintenance for the public who were required to pay Airways, Inc. for such service. This structure was one of the "2 Garages" taxed.

The other "Garage" was a small building, 15 x 20 feet, originally a carpenter shop but used in 1956 for vehicle storage by one of the stockholders of Airways, Inc.

A building, 30 x 40 feet, served the purposes of a public snack bar. This concession was promoted to their private gain by the father and mother of the two men who were the active members and owners of Airways, Inc. The father and mother also used the building as their living quarters. Lunches were sold to the public from late May to September. Coffee and doughnuts were served to persons patronizing two of the five daily flights of the regular passenger 'plane service.

The 5 Quonset huts, 20 x 40 feet, each, were utilized for storage. In four of them were airplane parts, new, used, usable and obsolete. The accumulation was one of years' accruing. In the fifth hut were old cots abandoned in navy days at the airport.

One building, 15 feet square, was a public toilet.

There were additional small structures of little moment here.

There were three runways with hard surfaces, 4500 x 150 feet, 3900 x 150 feet and 3600 x 150 feet, respectively.

The airport had been in operation for several years. It was a fixed base with radio beacon for navigation of aircraft, maintenance of 'planes, aircraft sales, air taxi and

gasoline service. There were night lighting facilities and runway beacons constantly available. No charge was exacted for landing or for lights. The operation of the field was for twelve months of the year and for public patronage.

There were three dump trucks used with plows for snow removal, a crane for lifting airplanes, a panel truck, a truck with flat body and a tractor, all the property of the defendant Town. Two runways were kept clear of snow, one for a length of 2500 feet, the other for a distance of 1500 feet.

Bar Harbor Airways, Incorporated is a corporation, the proprietorship, stock ownership and management of which were in two brothers. The direct object of the enterprise was the livelihood of its owners. On February 9, A. D. 1956 the defendant Town leased to Airways, Inc. for a term of years at an annual rental of $3000 the airport with the exception of such part of the administration-terminal building as was later leased to Northeast Airlines. In part consideration for the tenancy Airways, Inc. agreed to act as airport manager for the defendant Town. The Town of Bar Harbor by the lease reserved unto itself the right at will to enter the demised property for adding structures and buildings necessary for airport purposes. The lease was subject to cancellation on sixty days' notice by either party to it. The Town agreed to pay all taxes assessed and to carry fire and liability insurance upon the physical properties of the airport. The Town-lessor reserved a right to make and direct repairs to the landing area and public facilities and to protect the aerial approaches against obstruction and hazard. The lessor-Town reserved a paramount right, in a national emergency, to lease the landing area to the United States Government for military or naval use. This lease given Airways, Inc. was subordinated to any then existing or future agreement between the Town of Bar Harbor and the United States - -

"relative to the operation or maintenance of the airport, the execution of which has been or may be required as a condition precedent to the expenditure of Federal funds for the development of this airport."

The Town of Bar Harbor by the lease retained the right to - -

"enter to view and make improvements as the same may be necessary consistent with the use and operation of the premises as a public airport," - -

and to expel the lessee-corporation for waste or violation of any of the obligations of the lessee.

The lease contained the following covenant:

"The lessee agrees to operate the airport for the use and benefit of the public; to make available all airport facilities and services to the public, without unjust discrimination; and to refrain from imposing or levying excessive, discriminatory, or otherwise unreasonable charges or fees for any use of the airport or its facilities or for any airport service. It is understood and agreed that nothing herein contained shall be construed to grant or authorize the granting of an exclusive right within the meaning of Section 303 of the Civil Aeronautics Act."

(See, *Inhabs. of Owls Head* v. *Dodge,* 151 Me. 473, 478.)

With reference to the foregoing covenant quoted attention is directed to this excerpt from the Federal Statutes in effect in 1956:

"- - - there shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal Funds have been expended."

U. S. C. A., Title 49, Section 453.

On February 9, A. D. 1956, the date of the lease between the defendant Town and Airways, Inc., those same parties

entered into a written agreement supplementing the lease to this stated purpose:

"- - - particularly stating and defining the duties to be performed by the Airways as Airport Manager - - -."

Airways, Inc. agreed to furnish janitorial and custodial services for the administration-terminal building, to maintain the field, parking spaces and storage area in a presentable condition, to be responsible for the proper operation of the airport and of the aircraft and to keep the lights clean and capable of functioning. The defendant Town in turn committed itself to remove the snow and heat the terminal building in the event that an established airline used the airport in winter upon a schedule, to pay the cost of repairs, replacements and of technical skill necessary to keep the lights in working condition and to pay for current for the runway lights. The Town of Bar Harbor undertook to pay Airways, Inc. Two Thousand Dollars per annum for the latter's services under the agreement and to pay Airways, Inc. any money that might accrue to the defendant Town from the Maine Aeronautics Commission as reimbursement to the Town for snow removal.

On May 19, A. D. 1956 the defendant Town leased to Northeast Airlines for a scale of fees the use of the airport with all its facilities provided for common usage with any other authorized persons and an exclusive portion of the terminal building so as to enable Northeast Airlines to supply a regular passenger service to the public during the summer months and at other times if feasible and indicated. The lessor-Town engaged to maintain the airport lighted, heated, clean, manned and in repair, free of snow and obstructions, etc. The lease was subject to cancellation in the event of the taking of the airport by the United States, in the event of the loss to the lessee of the air mail carrying franchise or in the event of substitution by the Post Office

Department of an airport other than this so-called Bar Harbor Airport as the regional air mail depot. The lease was expressly subordinated to any existing or future agreement between the lessor-defendant and the United States "relative to the operation or maintenance of said Airport, the execution *(sic)* of Federal funds for the past or future development of the Airport."

Bar Harbor Airways, Inc., during 1956, under its lease and companion agreement, used the buildings against which the tax was assessed for the purposes hitherto reviewed. It sold gasoline for aircraft consumption, collected rental for storage of 'planes, repaired 'planes for a monetary consideration and acted as sales agent for a 'plane manufacturer. It conducted a flying school for gain. Yet it fulfilled the duties, all the while, of airport manager and its various businesses, with the exception of the Snack Bar of the parents, were within the control of the Civil Aeronautics Board.

In the light of the foregoing facts and circumstances the referee reported in substance that the defendant had succeeded in supporting its burden of establishing its exemption from taxation as to the property here assessed. The referee concluded that the dominant character of the use of all the assessed property had been for airport or aeronautical purposes and that all additional usage of that property had been incidental.

The plaintiff by her exceptions protests that the referee and the accepting justice have erred and assigns as specific errors the following:

A. There is no evidence to support the findings of fact requisite to justify the referee's conclusions.

B. The referee erred in his failure to find and rule that the defendant had the burden of proving by a preponder-

ance of the evidence that it was exempt from taxation by reason of a use of the assessed buildings for public airport or aeronautical purposes which must be distinguished from mere airport or aeronautical purposes.

C. The referee was wrong in failing to find and rule that the use of the assessed buildings was "so mixed, co-mingled and inseparable" that "it was impractical and un-reasonable" for the assessors of the Town of Trenton or for the referee "to ascertain the dominant use thereof."

D. The referee was incorrect in failing to find and rule that the dominant and principal use of the assessed build-ings was for private airport or aeronautical business under-takings as distinguished from a dominant use of public air-port or aeronautical facilities freely usable and accessible to the public.

The findings of fact of a referee are unassailable if there is any credible evidence to support them. *Hincks Coal Co.* v. *Milan and Toole,* 135 Me. 203, 206; *Melanson* v. *Reed Bros.,* 146 Me. 16, 18.

The evidence to fortify the referee in his conclusion that the dominant character of the use of the assessed buildings had been for airport and aeronautical purposes seems ample. That same evidence does more. It conveys an au-thentic summary impression that the use of the assessed buildings with all other properties of the integrated airport was primarily and mainly in the public interest. Through-out 1956 it is apparent that the airport of the Town of Bar Harbor was operated to accommodate and foster public avi-ation, commerce, the tourist business so prominent in Maine's economy and provisionally the public defense. An exclusive right to the use of any landing area or of any air navigation facility had been foreclosed to all because the Government had made expenditures upon the property. The project was continuously subject to the control of the Civil

Aeronautics Board. Management of an experienced and competent order was required and provided during all of the twelve months of the year. Regular public passenger conveyance and government air-mail service were afforded during the summer season upon a daily schedule. All air traffic was offered accommodations. Repairing, refueling, parking, storage, snow removal, night lighting and radio communication were supplied for the benefit of all who came to avail themselves. Lunches were made procurable. There were rest rooms. The Town of Bar Harbor was not engaged in a commercial pursuit. It owned an extensive property which returned to it a token net rental of $1000. Obviously, then, the operation of the airport was as for the municipality of Bar Harbor essentially public and patriotic. The defendant Town at all times by binding legal safeguards kept adequate control over the property which it in turn was obligated to conserve in anticipation of an ever possible national emergency. The defendant Town which can function only through agents or servants had to employ a specialized personnel to manage the airport. It engaged Airways, Inc. and contrived to have its corporate employee compensate itself by a profit fittingly repressed, from the incidental services rather than to pay it directly a set fee or a commission. Airways, Inc. also maintained an agency for the sale of a brand of 'planes and a school for student flying. It conducted some ten weekly public dances with admission charges. Yet the receipt of revenue for its functions by Airways, Inc. and its engagement in some collateral and extra pursuits was not of a scope or magnitude to affect essentially the tenor of the airport so as to give the commercial preponderance over the public motif.

The usage of the hangar and other buildings assessed, save for the occasional dances, even as that usage enured to the monetary and corporate advantage of Airways, Inc., all had a considerable congruity with the replete function-

ing of a public airport. Whatever use by Airways, Inc. might by the strictest standards be adjudged expendable from the public service was not exclusive but partial as to any given building and was not concentrated in any one facility. Even the "Snack Bar" contributed a service that must be regarded as indispensable to airmen and the traveling public from whom it drew its patronage.

The evidence supports a finding that in 1956 the principal and dominant use of the buildings assessed was for *public* airport and aeronautical purposes. Therefore those buildings were exempt from taxation for 1956 and would have enjoyed that immunity even under the statute as it was worded prior to the 1955 amendment. R. S. (1954), c. 92, Sec. 6; *Inhabitants of Owls Head* v. *Dodge,* 151 Me. 473, 480, 481.

The plaintiff specifies as exceptionable that the referee rested his ruling of exemption upon mere usage by the defendant of the assessed property for airport and aeronautical purposes rather than upon a usage for *public* airport and aeronautical purposes. Such a distinction or refinement is not determinative or of moment here. Were we to concede that the referee was in error as to the ground for his conclusion - - - and such concession we have not made

- - - that shortcoming would not vitiate his correct ruling.

> "- - - In other words, if the ruling is right, the fact that a wrong reason has been assigned therefor is immaterial. Warren v. Walker, 23 Me. 453; Petition of Kimball, 142 Me. 182; 49 Atl. (2nd) 70; Austin v. Inhabitants of St. Albans, 144 Me. 111; 65 Atl. (2nd) 32." *Water District* v. *Me. Turnpike Authority,* 145 Me. 35, 55.

This court accordingly deems it unnecessary for the merits of the instant case to proffer an opinion as to whether or not, under the statute controlling and as worded by force of the amendment of 1955, the buildings assessed would

have been exempted from taxation had the evidence supported only a finding of their unqualified usage for airport and aeronautical purposes by this defendant and not such a usage dedicated to public purposes.

The exceptant has failed to demonstrate that as a matter of law the evidence did not warrant the award against her. *Wood* v. *Balzano,* 137 Me. 87, 88.

*Exceptions overruled.*