HOWARD D. JOHNSON COMPANY and
Maine Turnpike Authority

v.

George W. KING, Sr. and Inhabitants
of the Town of Kennebunk.

Supreme Judicial Court of Maine.

Jan. 13, 1976.

See also, Me., 351 A.2d 534.

Pierce, Atwood, Scribner, Allen & Mc-Kusick by Fred C. Scribner, Jr., James B. Zimpritch, Portland, Sewall, Strater & Hancock by Frank E. Hancock, York, for plaintiffs.

Smith, Elliott, Wood & Nelson by Randall E. Smith, Charles W. Smith, Saco, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WERNICK, Justice.

Pursuant to Rule 72(b) M.R.C.P. this case has been reported to us on an agreed statement of facts by a Justice of the Superior Court (York County).

The Maine Turnpike Authority (hereinafter the "Authority") constructed two service areas consisting of restaurant, rest room and gasoline station facilities on two parcels of land situated in the Town of Kennebunk, Maine, and adjoining the northbound and southbound lanes, respectively, of the Turnpike roadway at Mile 24. The Authority has always had fee simple ownership of the land and buildings.

On June 3, 1971 the Authority entered into a lease with plaintiff Howard D. Johnson Company (hereinafter "Howard Johnson") covering operation of the two restaurant facilities. The lease term was to run from March 10, 1972 to December 13, 1983 unless the Authority should sooner terminate as of December 13, 1977. As lessee, Howard Johnson was obligated to pay all taxes on property owned, or business conducted, by it. Since 1971 Howard Johnson has been engaged under the lease in carrying on the restaurant business at both service areas at Mile 24 of the Maine Turnpike.

In April of 1973 George W. King, Jr., acting as Tax Assessor for the Town of Kennebunk, notified Howard Johnson to furnish to the Kennebunk Assessors a list of its taxable property in Kennebunk. In response, Howard Johnson mailed to the Office of the Assessors forms listing personal property used in the conduct of the corporation's business at Mile 24. Believing in good faith that, as submitted, these lists described all property owned by Howard Johnson subject to taxation, Howard Johnson gave no information pertaining to the real property which was owned by the Authority.

The present controversy arises because of Kennebunk's undertaking to assess against Howard Johnson taxes relating to the real estate owned by the Authority and used by Howard Johnson under lease.

As of April 1, 1973, and based on Kennebunk's 1973 tax rate of $27 per $1,000 valuation as applied to a valuation of $1,228,480 for the land and buildings housing the restaurant operations of Howard Johnson, the Town assessed taxes in the amount of $33,168.96 and billed them to Howard Johnson under the designation

"real estate taxes." Howard Johnson has refused to pay.

Howard Johnson subsequently filed with the Assessor, under the provisions of 36 M.R.S.A. § 841,[1] timely written application for abatement of real estate taxes assessed. Following denial of its application for abatement, Howard Johnson appealed to the Superior Court (York County) in accordance with 36 M.R.S.A. §§ 841 and 845,[2] and Rule 80B, M.R.C.P.

Howard Johnson filed its complaint in the Superior Court on April 11, 1974 naming as defendants George W. King, Sr., individually and as Tax Assessor of the Town of Kennebunk, and the Inhabitants of the Town of Kennebunk. Treating the tax in question as imposed on the fee simple interest in the real estate, Howard Johnson claimed that the tax was invalid because the property interest purportedly subjected to tax was in its entirety exempt from the taxation here undertaken by Kennebunk. Howard Johnson also claimed illegality in the amount of the assessment and in its intentional inequality relative to assessments of other taxpayers in the same class. Howard Johnson sought a declaratory judgment upholding its legal contentions as well as an order abating the totality of the tax assessment.

Defendants answered by denying all material allegations. In addition, on April 26, 1974 defendants moved to dismiss the complaint on grounds that plaintiff Howard Johnson had failed to comply with provisions of 36 M.R.S.A. § 706 and was thus barred from an appeal to the Superior Court.[3]

On August 22, 1974 the presiding Justice ordered the Authority joined as a party plaintiff under Rule 20(a), M.R.C.P. Thereafter, the presiding Justice reported the case to this Court for decision of all legal issues raised except those pertaining to valuation (should the legality of the tax be upheld).

We mention, to pass beyond, the issue raised by the motion of defendants to dismiss the complaint:—whether Howard Johnson is barred from the instant action because of alleged failure to comply with provisions of 36 M.R.S.A. § 706. Section 706 expressly excepts from those barred of a right to abatement a taxpayer disputing taxes assessed on "estates, . . . by law *exempt* from taxation." (emphasis supplied) Hence, when, as here, the taxpayer claims an exemption of the entirety of the property interest assessed and, as presently stipulated, has acted without

---

1. 36 M.R.S.A. § 841 states in pertinent part: "The assessors for the time being, on written application, stating the grounds therefor, within one year from date of commitment, may take such reasonable abatement as they think proper, provided the taxpayer has complied with section 706. Appeals from the decision of the assessors shall be taken in accordance with sections 844 and 845."

2. 36 M.R.S.A. § 845 states: "Any person entitled to appeal to a board of assessment review or to the county commissioners for an abatement of his taxes may, if he so elect, appeal under the same terms and conditions from the decision of the assessors to the Superior Court in and for that county."

3. Relative to this matter, 36 M.R.S.A. § 706 states: "Before making an assessment, the assessors or the chief assessor of a primary assessing area shall give seasonable notice in writing to all persons liable to taxation in the municipality or primary assessing area to furnish to the assessors or chief assessor of a primary assessing area true and perfect lists of their polls and all their estates, not by law exempt from taxation, of which they were possessed on the first day of April of the same year. "The notice to owners may be by mail directed to the last known address of the taxpayer or by any other method that provides reasonable notice to the taxpayer. "If any person after such notice does not furnish such lists, he is thereby barred of his right to make application to the assessors or the chief assessor of the primary assessing area or any appeal therefrom for any abatement of his taxes, unless he furnishes such list with his application and satisfies them that he was unable to furnish it at the time appointed."

fraudulent intent in filing such lists as were filed, this Court has held that

". . . consideration of the . . . issue [of whether the taxpayer is barred] leads inevitably to the merits of the case." *Depositors Trust Company v. City of Belfast,* Me., 295 A.2d 28, 29 (1972)

See also: *Holbrook Island Sanctuary v. Inhabitants of the Town of Brooksville,* 161 Me. 476, 478, 214 A.2d 660, 661, 662 (1965).

Accordingly, we address the merits.

### 1—*The Nature of the Tax*

Pursuant to our oft-cited power under Rule 72(b), M.R.C.P. to determine every material question of fact and law raised in a reported case, *Berry v. Daigle,* Me., 322 A.2d 320, 325 (1974), we resolve a threshold question concerning the identity of the property interest here taxed by Kennebunk.

Howard Johnson contends that the tax was assessed on the fee simple interest in the real estate owned by the Authority and characterizes the Town's claim before this Court that the tax was assessed on the leasehold interest of Howard Johnson as expedient afterthought.

We agree with the Howard Johnson position, basing our conclusion on inferences we draw from the Agreed Statement of Facts and from documents reproduced in the record.

The 1973 tax bill sent to plaintiff described the subject of the tax as "Real Estate, Map 37, Lot 5." The amount of tax ($33,168.96) was calculated at the ratio of $27 per $1,000 assessed valuation (the valuation being $1,228,480) in the same manner the real estate taxes on the fee simple interests of other residents were determined. The description of the property interest taxed, as well as the calculation

method, thus comport with the usual imposition of tax on a fee simple ownership interest in real property.

Documents subsequently emanating from Kennebunk town offices confirm that the tax assessed to Howard Johnson was upon the fee simple interest of the Authority. On April 25, 1974 the Kennebunk Tax Collector mailed his Notice Lien Claim and Demand to plaintiff as "tenant in possession." The Tax Collector chose this designation of plaintiff's status on the basis of instructions appearing in a footnote on the notice form reading:

"Strike out 'tenant in possession' where assessed to 'owner' and vice versa."

The notice form described the taxed "real estate" as "Land and buildings shown on Kennebunk Tax Map 37, Lot 5." In the present context, therefore, we take the Tax Assessor's description of Howard Johnson as "tenant in possession" to signify that (1) Howard Johnson was in possession of real estate owned in fee simple by the Authority; (2) by virtue of 36 M.R.S.A. § 553,[4] Howard Johnson, as such possessor, was liable for payment of the taxes assessed upon the fee simple interest of the Authority.

The Tax Collector's Lien Certificate filed by Kennebunk against the Howard Johnson premises on May 13, 1974 likewise designated plaintiff as "tenant in possession" pursuant to footnoted instructions identical to those mentioned aforesaid, and once again referred to the property as "Land and buildings shown on Kennebunk Tax Map 37, Lot 5."

None of the documents before us reveals express indication that the Town of Kennebunk purported to assess a tax on Howard Johnson's leasehold interest in lands owned by the Authority. Rather, the exhibits and the Agreed Statement of Facts

---

4. 36 M.R.S.A. § 553 provides:
"All real estate shall be taxed in the place

where it is to the owner or person in possession, whether resident or nonresident."

lead inescapably to the conclusion that the tax was imposed on the fee simple interest of the Authority, and it is only after-the-fact, by a metamorphosis attempted incident to the argument of this report, that Kennebunk characterizes the tax as being on the leasehold interest of Howard Johnson.

The Stipulation signed by the parties agreeing to the report of this case describes plaintiff as "party in possession . . . of the land and buildings described by and included within the assessment, . . .", and thus again resorts to the distinctions made by Section 553 when the tax is upon the fee simple ownership interest. Paragraph 6 of the Agreed Statement of Facts accompanying the report contains the following statement:

"The Authority at all times pertinent in this proceeding was the *owner of the land and buildings which are the subject of the assessment* which is here under appeal (hereinafter called the "premises")." (emphasis supplied)

A later paragraph reciting the amount of the tax specifies the property taxed as "the premises", thus referring back to paragraph 6's definition of that term, viz., the fee simple interest.

Our conclusion that the instant tax was assessed against the Authority's fee simple interest is supported by an analogous New York decision. In *People, ex rel. Albany and Bethlehem Turnpike Road v. Selkirk*, 180 N.Y. 401, 73 N.E. 248 (1905), a town had assessed taxes on "5 miles of highway" to a turnpike corporation which did not have fee simple ownership. The town

opposed the turnpike's petition for abatement on the ground that it had not undertaken to tax the fee simple interest in the land but had taxed another type of interest in the structures which it claimed was properly classifiable as an interest in realty. The rationale of the majority decision, stated in the language of Gray, J., was:

"What the assessors undertook to assess is '5 miles of highway,' . . . that includes, . . . the fee of the land. As we have seen, . . . all that the . . . [turnpike] possessed was something in the nature of a public easement in the highway, . . . .. Undoubtedly, the assessors intended only the fee of the land and their present contention appears to have been rather in the nature of an afterthought." (p. 405 of 180 N. Y., p. 249 of 73 N.E.)

## 2—The Alleged Illegality of the Tax

We proceed to the ultimately determinative issue whether the Town of Kennebunk has here acted lawfully in assessing against Howard Johnson, as the Authority's lessee, a tax on the Authority's fee simple interest in real estate.

■ Disputing the legality of such tax, Howard Johnson maintains that the tax is repugnant to the provisions of Section 9 of the "Act Creating the Maine Turnpike Authority", Chapter 69, P. & S.L. of Maine, 1941, as amended (hereinafter called the "Act").[5] The claim is that despite the textual language of Section 9 referring to the *Authority* as not being

". . . required to pay any taxes or assessments on any property acquired or

---

5. Said Section 9 provides:
"Sec. 9. Exemption from taxes. The accomplishment by the authority of the authorized purpose stated in this act being for the benefit of the people of the state of Maine and for the improvement of their commerce and prosperity in which accomplishment the authority will be performing essential governmental functions, the authority shall not be required to pay any taxes or assessments on any property

acquired or used by it for the purposes provided in this act nor shall the authority be required to pay any tax upon its income except as may be required by the laws of the United States of America, and the bonds or other securities and obligations issued by the authority, their transfer and the income therefrom, including any profits made on the sale thereof, shall at all times be free from taxation within the state of Maine."

used by it for the purposes provided in this act . . .",

the Legislature intended that the umbrella against liability for tax payments should also protect the Authority's private lessee, Howard Johnson, as the user of the Authority's property for "purposes provided in . . . [the] act."

Howard Johnson makes a second claim of exemption:—that the Authority is a state agency and, therefore, property owned by the Authority is "property of the State of Maine" exempt from taxation under 36 M.R.S.A. § 651–1–B regardless of its use.

We agree with Howard Johnson's interpretation of Section 9 of the Act as applied to the facts before us. We thus have no present occasion to address the issue of exemption predicated on the status of the Authority under said Section 651–1–B.

Defendants oppose plaintiff's assertion of exemption as grounded on Section 9 of the Act by a two-pronged argument: (1) the business conducted by Howard Johnson on the premises in question is not such "public use" as may justify relieving Howard Johnson from liability to pay the taxes here assessed; (2) in any event, the freedom from liability to pay taxes authorized by Section 9 of the Act for the Authority is inapplicable to relieve a private lessee of liability to pay the tax here assessed.

### 2–A—*Public Use*

In one facet, the question of public use raised by Kennebunk relates to the intent of the Legislature as manifested in Section 9 of the Act insofar as that Section establishes as a prerequisite of any non-liability for payment of tax, as claimed in relation either to ". . . property acquired or

used", that the basic acquisition or use be ". . . for the purposes . . . [of the] act . . . ."

As to this, Section 1 of the Act makes clear that the broad ultimate objective of the Legislature is, by the construction of a roadway,

"to facilitate vehicular traffic between the southwestern and northeastern sections of the state of Maine . . . ."

Section 9 of the Act clarifies that such project is

"for the benefit of the people of the state of Maine and for the improvement of their commerce and prosperity . . . ."

In further amplification the Legislature defined "turnpike" to include

"not only the turnpike and all tunnels and bridges connected therewith, overpasses and underpasses *but also all property* rights, easements and franchises relating thereto and *deemed necessary or convenient for the construction or the operation thereof.*" Section 3(c) of the Act (emphasis supplied)

Thus, from the outset, the Legislature was aware that the realization of its broad primary objective would necessitate various activities by the Authority beyond those involved directly in the construction, maintenance and operation of the actual roadway of the Turnpike.

The Legislature expressly affirmed this point specifically in relation to the operation of service areas when it amended the Act in 1953.[6] The 1953 amendment barred the use of turnpike property for "commercial purposes"[7] but excepted from those prohibitions

---

6. Chapter 91, P. & S.L. of Maine, 1953.
7. We find without merit defendants' argument that use of the word "commercial" in the 1953 amendment indicates legislative characterization of Howard Johnson's activities as non-"public." Instead, we view the mention of restaurant facilities in that amendment as excess caution lest the Act be mistakenly interpreted to bar use of Authority property for service areas.

". . . such gasoline filling stations, service and repair stations and restaurants as . . . [the Authority] deems necessary to service the needs of the traveling public while using the turnpike, . . . ." (emphasis supplied)

We hold that the business here conducted by Howard Johnson falls within activities deemed by the Legislature to be "purposes provided in . . . [the] act" within the contemplation of Section 9.

A second aspect of the "public use" question stems from Article IX, Section 8 of the Maine Constitution.[8]

▄▄▄ This Court has interpreted the "equal taxation" requirements of Article IX, Section 8 to permit exemptions when the property in question is devoted to "public use." We must evaluate, then, whether Howard Johnson's operation of restaurant facilities for the benefit of patrons of the limited access Turnpike highway here involved is such "public use" as is contemplated by the Constitution of Maine. We conclude that it is.

Since the meaning of "public use" in the context of taxation is similar to that assigned the concept relative to the exercise of eminent domain, *City of Portland v. Portland Water Company,* 67 Me. 135, 137

(1877); *cf. Brewer Brick Company v. Inhabitants of Brewer,* 62 Me. 62 (1873); *Opinion of the Justices,* 161 Me. 182, 210 A.2d 683 (1965), this Court's prior decisions in eminent domain cases will furnish strong guidance for present purposes.

In *Opinion of the Justices,* Me., 231 A.2d 431 (1967) the Justices observed that recent decisions of the Law Court had departed from the rigid views espoused in *Brown v. Gerald,* 10 Me. 351, 61 A. 785 (1905) and

"narrowed the gap between 'public use' on the one hand and 'public benefit' and 'public purpose' on the other and thus interpreted our Constitution as a live and flexible instrument fully capable of meeting and serving the imperative needs of society in a changing world." (p. 434 of 231 A.2d)

Accordingly, the 1967 *Opinion of the Justices* asserted that municipal parking facilities constituted a "public use." The Justices reached this conclusion by following the Law Court's earlier decision in *Crommett v. City of Portland,* 150 Me. 217, 107 A.2d 841 (1954) premised on the principle that "public use" exists, at least in a negative sense, when

"the whole public will achieve the prevention of . . . impediments to

---

8. Said Article IX, Section 8 reads:
"All taxes upon real and personal estate, assessed by authority of this State, shall be apportioned and assessed equally, according to the just value thereof; but the Legislature shall have power to levy a tax upon intangible personal property at such rate as it deems wise and equitable without regard to the rate applied to other classes of property. Nothing shall prevent the Legislature from providing for the assessment of the following types of real estate wherever situated in accordance with a valuation based upon the current use thereof and in accordance with such conditions as the Legislature may enact:
"1. Farms and agricultural lands, timberland and woodlands;
"2. Open space lands which are used for recreation or the enjoyment of scenic or natural beauty;

"3. Lands used for game management or wildlife sanctuaries.
"In implementing the foregoing, the Legislature shall provide that any change or use higher than those set forth above, except when the change is occasioned by a transfer resulting from the exercise or threatened exercise of the power of eminent domain, shall result in the imposition of a minimum penalty equal to the tax which would have been imposed over the 5 years preceding such change of use had such real estate been assessed at its highest and best use, less all taxes paid on said real estate over the preceding 5 years, and interest, upon such reasonable and equitable basis as the Legislature shall determine."

safety and welfare . . . ." (p. 434 of 231 A.2d)

Howard Johnson's operation of a restaurant serving turnpike patrons clearly falls within the concept of "public use" as clarified in *Crommett* and the aforesaid *Opinion of the Justices.* The facilities in question undoubtedly contribute to

"the safe and free movement of traffic upon the public ways." (p. 434 of 231 A.2d)

They afford opportunity for rest and refreshment to relieve the monotony resulting from high-speed driving for long periods which can lead to careless operation or drowsiness. The easy accessibility of the facilities encourages an operator already weary to stop to renew his vitality and alertness rather than to risk continuing to drive when his faculties may be impaired.

Further, the restaurant facilities, as here located, contribute to the Authority's operation of the roadway. There is immediate access from the roadway, and this reduces the necessary number of toll booth transactions since vehicles need not leave the Turnpike to obtain restaurant services. Cf. *Marshall v. Inhabitants of Town of Bar Harbor,* 154 Me. 372, 382, 148 A.2d 687 (1959).

Closely analogous for present purposes is our recent decision in *Maine Medical Center v. Lucci,* Me., 317 A.2d 1 (1974). We there held that parking facilities operated by a hospital were sufficiently contributory to its overall charitable purposes to qualify for the exemption accorded such institutions by 36 M.R.S.A. § 651–1–A.

Courts of other jurisdictions have considered the operation of restaurant facilities for patrons of limited access highways to be a "public use" within the contemplation of constitutional requirements predicated on that concept.

Section 14 of the Act creating the Pennsylvania Turnpike Commission, which our own Section 9 tracks verbatim, conferred tax-exempt status on turnpike property devoted to public use pursuant to constitutional provisions permitting exemptions in such circumstances. Examining the effect of Section 14 on a service area leased by Gulf Oil Corporation in light of the constitutional requirement of public use, a Court of Common Pleas in Pennsylvania (Dauphin County) concluded:

". . . a restaurant and service station such as those here described are necessary for the safe and efficient operation of the turnpike . . ." *Gulf Oil Corporation v. Middletown Area School District,* 50 Pa. D. & C.2d 247, 92 Dauph. 123, 129 (Ct.Comm.Pl.1969);

(opinion of Chancellor adopted en banc July 1, 1970). See also: *Illinois State Toll Highway Commission v. Korzen,* 32 Ill.2d 338, 205 N.E.2d 433, 434 (1965).

Finally, our finding of "public use", here, is in line with decisions of other Courts holding properly tax-exempt any subsidiary operation which furthers, directly or indirectly, the dominant public purpose for which exemption is authorized. See, e. g., *City of Newark v. Essex County Board of Taxation,* 103 N.J.Super. 41, 246 A.2d 509 (1968) (New York Port Authority); *Board of Assessors of Newton v. Pickwick Ltd., Inc.,* 351 Mass. 621, 223 N.E.2d 388 (1967) (Metropolitan Transit Authority); *Appeal of the Township of Moon,* 387 Pa. 144, 127 A.2d 361 (1956) (Municipal Airport).

### 2–B—*The "Private Lessee" Issue*

■ Having determined that the instant restaurant operations are for the purposes of the Act as referred to by Section 9, and comply with the "public use" requirements of Article IX, Section 8 of our Constitution as to exemption from property taxes, we turn to the final question whether it was the intent of the Legislature that the non-liability for payment of taxes established by Section 9 of the Act should extend beyond the Authority itself to a pri-

vate lessee of the Authority's real estate. We conclude that such was the legislative intent.

In support of their contention that Howard Johnson is legally liable to pay the tax here assessed, defendants rely upon 36 M. R.S.A. § 553. Strongly asserting the canon of statutory interpretation that exemptions, as disfavored exceptions to the general rule of taxation, must be strictly construed, see: e. g., *Inhabitants of Owls Head v. Dodge,* 151 Me. 473, 480, 121 A.2d 347, 352 (1956), defendants maintain that the Turnpike Act contains no tax-relief provisions expressly applicable to Howard Johnson as a private lessee of the Authority.

■ We may acknowledge that a principle of strict construction should be followed to avoid interpretations yielding overbroad exemptions from taxation, yet

"[t]he strict construction must still be a reasonable construction." *State YMCA of Maine v. Town of Winthrop,* Me., 295 A.2d 440, 442 (1972).

We find appropriate guidance, here, in the rationale expressed in *Greaves v. Houlton Water Company,* 143 Me. 207, 212, 59 A.2d 217, 219 (1948):

"It is fundamental that we look to the purpose for which a law is enacted, and that we avoid a construction which leads to a result clearly not within the contemplation of the lawmaking body. Above all, we should seek to avoid an interpretation which leads to a result which is absurd, even though to do so we may have to disregard the strict letter of the enactment. This rule rescues legislation from absurdity. It is not judicial legislation; it is seeking to enforce the true sense of the law, notwithstanding its imperfection, or generality of expression."

■ We have already clarified that the ultimate aim of the Act is to facilitate recreational and commercial traffic over the length of this State. Equally important to the Legislature was the manner in which such a large undertaking would be financed. Following the Pennsylvania example, the Legislature determined to accomplish the project through creation of an independent "Authority." After constructing the Turnpike with funds raised through the issuance of bonds and retiring that indebtedness over a period of years using revenues derived from tolls and other income, upon retirement of the debt the Authority would itself cease to exist. Act, §§ 6, 16. Its property and revenues would then revert to the State. Act, § 16. The independence desired for the Authority was to be achieved by forbidding the Authority the credit of the State while freeing it from payment of state or local taxes, and levy or sale by virtue of judicial process. Act, §§ 6, 9, 4(a), 14.

Interpreting Section 9 against this background, and applied to the instant facts, we conclude that extension to Howard Johnson of the non-liability for payment of the tax here assessed best effectuates the purposes of the Act.

Included in Section 9 is the provision:

"bonds or other securities and obligations issued by the authority, their transfer and the income therefrom, including any profits made on the sale thereof, shall at all times be free from taxation within the state of Maine."

This is a specific concrete manifestation of a belief by the Legislature that persons other than the Authority itself should be freed of tax liability as a significant measure to achieve the overall objectives of the Act. The legislative rationale behind relieving holders of Authority securities from tax liabilities seems clearly to be that this tends to increase the marketability of the Authority's securities and promotes the purposes of the Act since improved saleability of bonds issued by the Authority expedites retirement of the indebtedness they represent, thus to bring to earlier fruition the termination of the project.

Freeing Howard Johnson, here, from liability to pay taxes assessed on the Authority's fee simple interest in land used under lease by Howard Johnson for the purposes of the Act is similarly justifiable. We may fairly attribute to the Legislature the belief that a private specialist in the restaurant business is better equipped to operate turnpike service areas at maximum efficiency than the Authority itself. Indeed, the 1953 amendment allowing lease of Authority property for such purposes tacitly approves the practice. The Legislature may also be taken to have thought that subjecting the private lessee to liability for taxes on the Authority's fee simple interest in real estate would produce an ultimate indirect burden on the Authority itself, for example, by decreasing the amount of rental the lessee would be willing to pay. In similar vein, the Legislature could reasonably have anticipated that a lowering of the amount of rentals the Authority would realize from leasing its operations to private concerns might induce the Authority to operate on its own and forego the economies likely to flow from the greater efficiency of a private operator. Such prospect would be contrary to the Legislature's desire for economy as the overall objective pervading the Act.

Interpreting Section 9 of the Act to extend the benefit it confers to the Authority's private lessee utilizing the property for the public purposes contemplated by the Act accords with usual canons of statutory construction.

Such result contravenes no express provisions of the Act. It is consistent, moreover, with the provisions of Section 9 authorizing a non-liability to pay taxes to arise as to property either "acquired *or* used" (emphasis supplied) by the Authority. Thus, the benefits of Section 9 may accrue solely because the Authority has "acquired" the property (as *one alternative*) and independently of whether the

Authority is itself "using" the property "acquired" by it.

We find additionally significant in this regard a 1967 amendment to the statute exempting municipalities from taxation of municipal parking facilities (30 M.R.S.A. § 4262). That amendment, by taking the precaution of expressly denying exemption to private operators of such facilities, indicates that exemption for private lessees performing public functions may be expected if the statute is otherwise silent.

The construction urged by defendants risks the untoward result warned against in *Greaves v. Houlton Water Company*, supra, that denial of exemption here could effectively preclude the Authority from leasing service areas for private operation, thus to increase costs, in direct opposition to the Act's efforts to minimize them, and improperly transform a provision concerned with expressing the Legislature's taxation policy into one delineating operating policies to be followed by the Authority.

Supporting our approach, here, are decisions of other courts concerning toll road service areas, one of them construing an identical tax non-liability provision.

In *Gulf Oil Corporation v. Middletown Area School District*, supra, a Pennsylvania Court, was asked to enjoin enforcement of a local tax on the leasehold interest of the operator of turnpike service area facilities. The Court ruled that Section 14 of the Act creating the Pennsylvania Turnpike Commission precluded such assessments.[9] Section 14 of the Pennsylvania Act was adopted in its entirety by our Legislature as Section 9 of the Maine Turnpike Authority Act.

Similarly, in *Walter Reade, Inc. v. Township of Dennis*, 36 N.J. 435, 177 A.2d 752 (1962), the New Jersey Court held that the tax exemption provisions of legislation

9. There was testimony before the Court in the *Gulf Oil* case which tended to show that the tax would ultimately fall on the Turnpike Commission.

**534**

governing construction and maintenance of the Garden State Parkway extended to a private lessee conducting restaurant business at Parkway service areas. See also: *Illinois State Toll Highway Commission v. Korzen,* supra.

 Buttressing this view, too, are our holdings concerning the question of the taxability of public property in the hands of a private entity. A single guiding principle suffuses those decisions:—use of exempt property by a private party does not defeat the exemption if the private party's use is the public use underlying the exemption. *Inhabitants of Owls Head v. Dodge,* supra. See also: *Marshall v. Inhabitants of Town of Bar Harbor,* supra.

The same logic induces the conclusion, here, that the activities carried on by Howard Johnson, and which, as already held ante, are a "public use" in the requisite sense, fall within the "non-liability to pay taxes" protections established by Section 9 of the Act as an independently operative specific limitation upon such generalized authority to assess taxes as may be embodied in 36 M.R.S.A. § 553.[10]

The entry is:

(1) It is adjudicated:

(a) the Town of Kennebunk's assessment, as of April 1, 1973, of a tax upon the fee simple interest of the Authority in land and buildings described on the records of the Town of Kennebunk as Map 37, Lot 5, being two restaurant buildings and land owned by the Maine Turnpike Authority in Kennebunk, and appropriated for public use in furtherance thereof by said Maine Turnpike Authority, and leased by the Maine Turnpike Authority to Howard D. Johnson Company—said assessment being evidenced by a 1973 tax bill in the amount

of $33,168.96 sent to Howard D. Johnson Company by the Town of Kennebunk—imposes a tax obligation which is invalid because it is the product of an assessment upon an interest in real property which, in the circumstances here involved, is entirely exempt from taxation by virtue of Section 9 of Chapter 69, P. & S.L., 1941, as amended; and

(b) therefore, plaintiff Howard D. Johnson Company is entitled to the complete abatement sought by it;

(2) Case remanded to the Superior Court for entry of judgment in accordance herewith.

All Justices concurring.

---

10. In view of this decision, we have no present occasion to reach the issue of whether 36 M.R.S.A. § 553, from within its own confines, purports to establish the liability of a

"person in possession" to pay a tax assessed on the fee simple interest in real estate for which the owner of the fee simple interest is exempted from liability for payment.